[Cite as *State v. Velez*, 2014-Ohio-1788.]

**IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
PUTNAM COUNTY**

**STATE OF OHIO,**

    **PLAINTIFF-APPELLEE,**               **CASE NO.  12-13-10**

    **v.**

**DOMINGO VELEZ, JR.,**              **O P I N I O N**

    **DEFENDANT-APPELLANT.**

**Appeal from Putnam County Common Pleas Court
Trial Court No. 2012 CR 98**

**Judgment Affirmed**

**Date of Decision:   April 28, 2014**

**APPEARANCES:**

    *Esteban R. Callejas* **for Appellant**

    *Todd C. Schroeder*  **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Domingo Velez, Jr. ("Velez"), appeals the Putnam County Court of Common Pleas' judgment entry of sentence. He argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence and that the trial court erred by denying his motion for separate trials, by allowing a juror to remain despite concerns about the juror's ability to hear, and by allowing improper character evidence. For the reasons that follow, we affirm.

{¶2} On June 20, 2012, the Putnam County Grand Jury indicted Velez on Count One of felonious assault in violation of R.C. 2903.11(A)(1) "and/or" 2903.11(A)(2), a second-degree felony; Count Two of possession of cocaine in violation of R.C. 2925.11(A), (C)(4)(a), a fifth-degree felony; and, Count Three of menacing in violation of R.C. 2903.22(A), a fourth-degree misdemeanor. (Doc. No. 1). Counts One and Two stemmed from an October 13, 2012 incident between Velez and his wife at their residence. (*See id.*) Count Three stemmed from a September 28, 2012 traffic stop of Velez by Putnam County Deputy Sheriff Greg Westrick. (*See id.*)

{¶3} The trial court held an arraignment hearing on November 9, 2012. (Doc. No. 15). Velez appeared with his court-appointed counsel and entered pleas of not guilty. (*Id.*).

{¶4} On April 8, 2013, the trial court scheduled a jury trial for June 3, 2013 and ordered that any pretrial motions be filed by May 1, 2013. (Doc. No. 59). On May 31, 2013, the trial court rescheduled the jury trial from June 3, 2013 to June 24, 2013. (Doc. Nos. 76, 86, 87).

{¶5} On the morning of June 21, 2013, Velez filed a "motion to file instanter," requesting that the trial court allow him to file a motion to sever trial, in which he requested that the trial court sever Count Three and hold a trial on that count separate from the trial on Counts One and Two. (Doc. Nos. 98, 109). Later that morning, plaintiff-appellee, State of Ohio ("State"), filed a response opposing Velez's motion to sever. (Doc. No. 99).

{¶6} A few minutes before the jury trial commenced on June 24, 2013, the trial court met with counsel in chambers and granted Velez's motion to file the motion to sever but denied the motion to sever. (June 24-25, 2013 Tr., Vol. One, at 5); (Doc. Nos. 107, 109).

{¶7} On June 24 and 25, 2013, a jury trial was held on the indictment. (June 24-25, 2013 Tr., Vol. One, at 5); (Doc. No. 67). The jury found Velez guilty of Counts One and Three, felonious assault and menacing, but not guilty of Count Two, possession of cocaine. (June 24-25, 2013 Tr., Vol. Two, at 424); (Doc. No. 104).

{¶8} On August 8, 2013, the trial court sentenced Velez to an aggregate term of six years imprisonment on Counts One and Three and ordered that Velez pay court costs. (Aug. 8, 2013 Tr. at 19-20); (Doc. No. 118). The trial court filed its judgment entry of sentence the next day. (Doc. No. 118).

{¶9} On September 3, 2013, Velez filed a notice of appeal. (Doc. No. 122). Velez raises four assignments of error for our review. To facilitate our analysis, we will first address Velez's second assignment of error, followed by his first, third, and fourth assignments of error.

### Assignment of Error No. II

**The trial court erred when it accepted the jury's guilty verdict which was clearly against the manifest weight of the evidence and sufficiency of the evidence.**

{¶10} In his second assignment of error, Velez argues that the jury's verdict finding him guilty of Counts One and Three was against the manifest weight of the evidence and based on insufficient evidence. As for his felonious-assault conviction, Velez argues that his wife "had motive to fabricate the felonious assault story" against him and that there are inconsistencies and contradictions in his wife's account of the events of October 13, 2012. (Appellant's Brief at 12). As for his menacing conviction, Velez argues that the seemingly threatening statement he made to the sheriff's deputy was actually a threat that Velez would

commit suicide, not harm the deputy, because Velez was depressed for a number of reasons.

**{¶11}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶12} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶13} Velez was convicted of felonious assault in violation of R.C. 2903.11(A)(2)[1] and menacing in violation of R.C. 2903.22(A). R.C. 2903.11 sets forth the offense of felonious assault and provides: "No person shall knowingly *

---

[1] Count One of the indictment charged Velez with felonious assault "in violation of [R.C.] 2903.11(A)(1) and/or (2)." (Doc. No. 1). Based on the indictment's use of "and/or," it appears the Grand Jury indicted Velez for felonious assault under either R.C. 2903.11(A)(1) or 2903.11(A)(2) or both. However, the trial court instructed the jury as to felonious assault only under R.C. 2903.11(A)(2), and the jury found Velez guilty of felonious assault under that statutory provision. (*See* Doc. No. 118). Therefore, we consider Velez's arguments concerning the sufficiency and manifest weight of the evidence as to Count One only under the elements of R.C. 2903.11(A)(2).

* * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon * * *." R.C. 2903.11(A)(2).

{¶14} R.C. 2903.22 sets forth the offense of menacing and provides: "No person shall knowingly cause another to believe that the offender will cause physical harm to the person * * *." R.C. 2903.22(A).

{¶15} At the beginning of its presentation of evidence, the State played for the jury a portion of State's Exhibit 1, a video of Road Patrol Deputy Sheriff Greg Westrick's September 28, 2012 traffic stop of Velez.[2] (June 24-25, 2013 Tr., Vol. One, at 151-153). As depicted in the video, Westrick stopped Velez for speeding, and Velez was immediately "irate," according to Westrick's statement to the dispatcher in the video. (State's Ex. 1).

{¶16} After Westrick asked Velez to sign the citation, Velez pointed his finger at Westrick and said, "next time you come to my house, you better have a warrant or bring a body bag." (*Id.*). Velez immediately denied making the statement, but Westrick and the officer who arrived to back him up placed Velez under arrest for menacing. (*Id.*). As Velez was sitting handcuffed in Westrick's cruiser, he admitted making the "body bag" statement. (*Id.*). Once at the Putnam County Jail, Velez told Westrick that he did not want to forget what Westrick looked like and that he is an expert with a handgun and a rifle. (*Id.*).

---

[2] Velez did not object to the portion of the video played for the jury.

{¶17} After playing the video, the State's first witness was Velez's wife, Sherry Velez. (June 24-25, 2013 Tr., Vol. One, at 156). Sherry testified that Velez told her about his September 28, 2012 traffic stop. (*Id.* at 157-158). Specifically, Velez told her that "he got picked up," that "it was entrapment," that "somebody had narked him out," and that he "told the police that he wasn't afraid of them and that they had better bring body bags, lots of body bags." (*Id.* at 158). She testified that Velez acknowledged that he made that threat to the police. (*Id.*). Velez has possessed knives and guns, but Sherry gave them to her brother to keep for her protection while Velez was in Texas from February 17 to September 7, 2012. (*Id.* at 157-159).

{¶18} Sherry also testified concerning the October 13, 2012 incident between Velez and her at their residence in Leipsic, Ohio. (*Id.* at 159). She testified that after beginning her usual morning routine, Velez confronted her with a 10-inch carving knife in his hand. (*Id.* at 161-162). According to Sherry, Velez asked her if she was ready to die or afraid to die, and he told her that he was ready to die and not afraid to die. (*Id.* at 162). Sherry testified that she picked her cellphone and keys up off the counter to call for help or get out of the house; however, when Velez pointed the knife within two feet of her and said, "Give them to me," she handed them to him. (*Id.* at 162-163).

{¶19} Sherry testified that Velez grabbed her right arm above her elbow and, with the knife in his other hand, led her upstairs to a room—referred to by the Velezes as the "patch room"—in which Sherry had stored Velez's belongings in boxes. (*Id.* at 163-164). Sherry experienced "a little" pain when Velez grabbed and held her arm, and she knew he was serious because he had a hold of her arm and a knife. (*Id.* at 163).

{¶20} Sherry testified that once they were in the patch room, Velez told her she was not going to work and was instead going to unpack the boxes storing Velez's belongings. (*Id.* at 164). According to Sherry, while she was bringing out the boxes, Velez came at her with the knife and said, "Are you afraid to die? I'm not." (*Id.*). Sherry testified that she tried to build up the boxes around her for protection. (*Id.*). She testified that as she was taking something out of a box, she heard the knife Velez had been holding go into the floor, and she saw the knife sticking straight up out of the floor a couple feet away from Velez, which broke the tip off the knife. (*Id.* at 164-166).

{¶21} According to Sherry, Velez "just kept threatening to do bodily harm to [her] and [her] family." (*Id.* at 165). She testified that she saw "the hate and the anger in his eyes and on his face that day" and that she believed he was going to kill her. (*Id.*). Sherry testified that she begged Velez to allow her to collect her things and go, but he did not allow her to do so. (*Id.* at 166). According to Sherry,

Velez went downstairs, and Sherry remained upstairs and took "a real quick shower." (*Id.*).

**{¶22}** Sherry testified that Velez came back upstairs with a pocket knife and stood in the doorway where he told Sherry "how nice [her] jugular was and that it would take a quarter of an inch, and [she] would bleed out before the EMS was called and that he could burn the house down and nobody would know any different." (*Id.* at 166-167). According to Sherry, while Velez was threatening to use the pocket knife on her, he came within a couple feet of her and was holding the pocket knife out in front of him, pointing it at her. (*Id.* at 167). Sherry testified that the knife was closer than a couple feet from her. (*Id.*).

**{¶23}** According to Sherry, based on the layout of the house, she could not go downstairs and out the door without Velez seeing her. (*Id.* at 167-168). She also testified that Velez held a knife to her and asked her if she was ready to die a total of "[f]our or five times." (*Id.* at 168). Sherry's best guess was that Velez held her captive for a total of approximately an hour and a half. (*Id.* at 168-169).

**{¶24}** Sherry testified that she was upstairs and may have heard the car, so she went downstairs and saw that the car was gone. (*Id.* at 169). She reached for the phone, but it had been unplugged, so she plugged it back in and called her son-in-law, who did not answer, then Velez's sister, Francis Settlemeyer, who she reached and asked to come get her. (*Id.* at 169-170).

{¶25} Sherry testified that she then grabbed her things, went out the door, and "started walking, running down the street." (*Id.* at 170). According to Sherry, Velez had taken Sherry's car keys and cellphone, and her driver's license, credit cards, and other information was in the console of the car. (*Id.* at 170-171). Sherry did not call the police because she was afraid Velez would retaliate against her. (*Id.* at 171). She testified that Velez had in the past threatened to kill her if she called the police on him. (*Id.* at 171-172).

{¶26} Sherry testified that Settlemeyer's husband found her down the street, picked her up, and took her back to the Settlemeyer house. (*Id.* at 172). Settlemeyer told Sherry she needed to go back to the house because someone had called the police and the sheriff's department was on the way. (*Id.*). Sherry then went back to the house and spoke with the police. (*Id.*).

{¶27} Sherry testified that she has suffered anxiety as a result of the incident with Velez on October 13, 2012. (*Id.* at 174). She wound up in the hospital after severe vomiting and dehydration accompanied her stress and anxiety. (*Id.*). Her doctors put her on medications, and when she did not get any better, she ended up back in the hospital for surgery. (*Id.*).

{¶28} Sherry acknowledged that she was going through a divorce with Velez but testified that she was not making up a story about him. (*Id.* at 175). She

said she would have preferred to not have to testify in court, and she wished the incident never would have happened. (*Id.*).

{¶29} At the conclusion of her direct examination, Sherry identified several exhibits for the State. (*Id.* at 175-179). Among the exhibits were State's Exhibits 2, 3, and 4, which Sherry identified as different photographs of the carving knife Velez used to threaten her. (*Id.* at 175-177). She identified State's Exhibit 5 as a photograph of the pocket knife that Velez used when threatening to cut her jugular. (*Id.* at 177-178). Sherry identified State's Exhibit 6 as a photograph of her cellphone, which Velez took with him when he left the residence on October 13, 2012. (*Id.* at 178). Sherry concluded her testimony by saying that based on the circumstances she described, she believed Velez was taking substantial steps to cause her harm with a knife. (*Id.* at 179).

{¶30} On cross-examination, Sherry testified that the day after Velez's arrest for menacing, Velez told her that he was set up and entrapped, and that he told the authorities that they had better bring "a lot of body bags" because he was not afraid of them. (*Id.* at 180-181). Sherry believed Velez was serious, and she was scared for the police officers, but she admitted she did not alert anyone, including the police, even though she lives only a block and a half from the police station. (*Id.* at 181-183). Sherry said that Velez did not mention the names of any law-enforcement officers. (*Id.* at 183).

{¶31} Sherry testified that there were three telephones—one each in the dining room, living room, and upstairs—plus her cellphone in the house on October 13, 2012. (*Id.* at 184). While Velez was in Texas for seven months, Sherry packed up his belongings and removed his guns from the home. (*Id.* at 185). She identified Defendant's Exhibit A as a copy of the complaint for divorce she had her attorney file on September 28, 2012—three weeks after Velez returned from Texas and one day before Velez told her about his September 28, 2012 incident with law enforcement. (*Id.* at 185-187).

{¶32} Sherry identified Defendant's Exhibit B as a copy of the written statement she gave the Putnam County Sheriff's Office on October 13, 2012—the day of her incident with Velez. (*Id.* at 187-188). Sherry acknowledged that she did not mention two knives in her statement, but she did say in her statement that Velez threatened her "verbally [and] with kitchen carving knife," that he ordered her to find his Rambo knife among his belongs, and that he said, while holding a knife, that she had a "nice jugular," that it would take only a quarter of an inch to cut and she would bleed out before help could arrive, and that he would burn the house down. (*Id.*); (Defendant's Ex. B). She also acknowledged that she did not mention in her statement Velez's asking her whether she was ready to die and his telling her that he was not afraid to die. (June 24-25, 2013 Tr., Vol. One, at 190). She testified she was "pretty shook up at the time" she made the statement. (*Id.*).

{¶33} Sherry testified that in October 2012, she had surgery for a blockage caused by her small intestine attaching to her abdominal wall. (*Id.* at 189). According to Sherry, the intense vomiting she experienced after the October 13, 2012 incident "brought on the symptoms [of that medical condition] sooner." (*Id.* at 190). She was off work for two and a half months after her surgery. (*Id.* at 192). She was working fulltime before her surgery, and she went back to work fulltime after the two-and-a-half-month, post-surgery period. (*Id.*).

{¶34} Sherry acknowledged that the car Velez left the house in on October 13, 2012 was marital property, although it was in her name. (*Id.* at 193-194). She said there were two other vehicles at the house that day, in addition to the car in which Velez left. (*Id.* at 194).

{¶35} She testified that when Velez grabbed her arm and led her upstairs with the knife, he grabbed her right arm with his right hand. (*Id.* at 194-195). She did not see the knife go into the floor or whether Velez threw the knife. (*Id.* at 195). She testified that after that, Velez did not go downstairs right away, but once he did, she slipped into the bedroom with the telephone and discovered it was disconnected. (*Id.* at 196). She acknowledged that she did not include that in her statement to the sheriff's office. (*Id.*). According to Sherry, she took her shower "rapidly" while Velez was still in the house because she begged him to allow her to leave with her belongings, and she was determined to get to work, and she

showers before going to work. (*Id.* at 197). Sherry testified that when she left the house after she realized Velez left in the car, she headed toward Settlemeyer's house, not the police station a block and a half away. (*Id.* at 199).

{¶36} The State's next witness was Brad Nelson, Road Patrol Sergeant at the Putnam County Sheriff's Office. (June 24-25, 2013 Tr., Vol. Two, at 208). He testified that he was dispatched to the Velez residence on October 13, 2012 in response to a 911 call. (*Id.* at 209-210). According to Nelson, Sherry was at the house and was crying and very upset and afraid. (*Id.* at 210). He testified that Sherry began but had a difficult time completing her written statement because she was shaking, so Nelson asked Sherry questions and wrote down her responses on her statement form. (*Id.* at 211-212). He identified Defendant's Exhibit B as Sherry's written statement. (*Id.*).

{¶37} As Sherry was providing her statement, she told Nelson that Velez had threatened her with two knives. (*Id.* at 213). Nelson retrieved one of the two knives—the carving knife—at the scene. (*Id.*). Sergeant Brian Siefker of the Putnam County Sheriff's Office gave Nelson the second knife—the pocket knife—at the sheriff's office. (*Id.*). Nelson observed several boxes in the patch room, and "some were stacked, some were laying [sic]." (*Id.* at 214-215).

{¶38} Nelson testified that after Velez left the house on October 13, 2012, he was located in Ottawa with his dogs. (*Id.* at 215). When Velez was arrested,

he had in his possession several of Sherry's personal property items—including her credit cards, driver's license, Social Security card, and cellphone—which were returned to Sherry. (*Id.* at 217). Nelson identified State's Exhibits 2, 3, 4, 5, and 6 as photographs he took of the two knives and of Sherry's cellphone. (*Id.* at 216-217).

{¶39} On cross-examination, Nelson testified that Sherry told him that Velez "had the knife in one hand and had her by the arm and was dragging her up the steps." (*Id.* at 218). Nelson acknowledged that there is a difference between dragging and pulling. (*Id.*). According to Nelson, Sherry did not have any bruising, marks, or bleeding that he could see when he encountered her on October 13, 2012, nor did he learn of any later. (*Id.* at 219-221). Nelson testified that Sherry told him that it hurt when Velez grabbed her by the arm, but it was not a "lingering hurt." (*Id.* at 220). Nelson checked Sherry's arm but concluded it did not require medical attention. (*Id.*). Nelson did not observe any signs suggesting that Sherry was under the influence of alcohol, drugs, or medications. (*Id.* at 221). He testified that it is a couple blocks from the Velez residence to the local police station. (*Id.*).

{¶40} Nelson was not present when Velez was arrested in Ottawa. (*Id.* at 222). He collected the carving knife at the Velez residence, and he believed he

had gloves on when he did so. (*Id.*). (*See also id.* at 230). The knife was not tested for fingerprints. (*Id.* at 224).

**{¶41}** Nelson identified Defendant's Exhibit C as his narrative containing his investigative notes from his visit to the Velez residence on October 13, 2012. (*Id.* at 227). Nelson testified that Sherry told him that Velez said he was not afraid of law enforcement. (*Id.* at 226). Nelson did not mention that in his report, but Sherry's report does say Velez "made threats of not being afraid of law enforcement." (*Id.* at 228); (Defendant's Exs. C, B).

**{¶42}** On re-direct examination, Nelson testified that the Leipsic Police Department is not staffed during the day on weekends, and Nelson recalled October 13, 2012 being a Saturday or Sunday, but he believed a Saturday. (June 24-25, 2013 Tr., Vol. Two, at 228-229, 222). Nelson acknowledged that his narrative states that Sherry told him that Velez "pulled her up the stairs." (*Id.* at 229); (Defendant's Ex. C). Nelson said he would define "pulling" as "leading by force" or "[p]ulling someone somewhere where they don't want to go." (June 24-25, 2013 Tr., Vol. Two, at 229). He testified that the knife he collected at the Velez residence was the carving knife used in the Velez kitchen. (*Id.* at 230).

**{¶43}** The State's next witness was Brian Siefker, Road Patrol Sergeant at the Putnam County Sheriff's Office. (*Id.* at 231). Siefker testified that he was dispatched to the Advance Auto Parts store in Ottawa where he assisted in the

situation involving Velez. (*Id.* at 232). He patted down Velez after he was handcuffed and discovered a black, four-inch-blade, folding pocket knife, of which he took possession and turned over to Nelson. (*Id.* at 232-233). Siefker identified State's Exhibit 5 as a photograph of the pocket knife that he found on Velez's person. (*Id.* at 233-234).

{¶44} On cross-examination, Siefker testified that he carries a pocket knife all the time. (*Id.* at 234). He said he arrived at Advance Auto Parts after Velez exited the store. (*Id.*). He could not recall what Velez was wearing or if he was wearing slippers and pajama pants. (*Id.* at 234-235).

{¶45} The State also called Lee Rosengarten, Special Deputy at the Putnam County Sheriff's Office. (*Id.* at 262). He accompanied Nelson at the Velez residence on October 13, 2012 and observed Sherry, who he testified was "visibly shaken" and "just really distraught." (*Id.* at 264). According to Rosengarten, Sherry's arms and hands were shaking while he and Nelson talked to her. (*Id.* at 264-265).

{¶46} Rosengarten left the Velez residence for Advance Auto Parts when the Ottawa Police located Velez's vehicle there. (*Id.* at 265-266). After Velez was taken into custody, Rosengarten transported him to the Putnam County Jail. (*Id.* at 267). Rosengarten identified State's Exhibit 9 as a copy of the video that his cruiser captured on October 13, 2012, including during his transport of Velez

to the jail. (*Id.*). A portion of the video was played for the jury. (*Id.*). During the video, Velez can be heard calling Deputy Greg Westrick an "asshole" and explaining to Rosengarten how he could tell Westrick during the September 28, 2012 traffic stop, "Next time you fuck with me, I'm going to put you in a body bag." (State's Ex. 9).

{¶47} The State's next witness was Francis Settlemeyer, Velez's sister. (June 24-25, 2013 Tr., Vol. Two, at 270-271). Settlemeyer testified that after learning of the alleged threats that Velez made against Westrick on September 28, 2012, she advised the sheriff's department that they should take the threats "very seriously." (*Id.* at 271-272). Settlemeyer also testified that on October 13, 2012, Sherry called her house, and her husband answered the call. (*Id.* at 273). According to Settlemeyer, she had her son's girlfriend, who was at the Settlemeyer residence at the time, call 911 to report domestic violence and request that the police go to 350 Belmore Street in Leipsic. (*Id.* at 274). Her son's girlfriend made the 911 call in Settlemeyer's presence, and Settlemeyer identified State's Exhibit 10, which was played for the jury, as a fair and accurate depiction of the call. (*Id.* at 275-277).

{¶48} Settlemeyer testified that her husband brought Sherry back to the Settlemeyer residence, at which point she drove Sherry back to the Velez residence so they could meet law enforcement there. (*Id.* at 277-278).

Settlemeyer said Sherry was very shaken up and ready to start crying. (*Id.* at 278). According to Settlemeyer, who has known Sherry for approximately 12 years, Sherry is normally a very passive, calm person. (*Id.*). Sherry described for Settlemeyer how Velez pulled a knife, put it to Sherry's throat, and asked her if she was ready to die. (*Id.* at 278-279). Settlemeyer testified that Sherry has maintained the same version of the events since October 13, 2012, and Sherry continues to become upset when discussing the incident. (*Id.* at 279).

{¶49} On cross-examination, Settlemeyer testified that when her husband received the call from Sherry, there was no mention of a knife. (*Id.* at 280). On re-direct examination, Settlemeyer testified that when Sherry called, Sherry said that she had to get out of the house and requested that someone come get her right away. (*Id.* at 281).

{¶50} The State's final witness was Greg Westrick, Road Patrol Deputy at the Putnam County Sheriff's Office. (*Id.* at 286). Westrick testified that on September 28, 2012, he initiated a traffic stop of Velez after observing him traveling at a high rate of speed—reaching 104 miles per hour, according to Westrick's radar. (*Id.* at 289-290). Westrick testified that when he approached Velez's vehicle, Velez was immediately irate and belligerent. (*Id.* at 290-291). In Westrick's 20 years of road patrol, he has referred maybe one case every five years for menacing prosecution. (*Id.* at 291). Given Velez's behavior, Westrick

called for backup. (*Id.*). Westrick testified that Velez leaned toward him as he wrote the ticket and said, "The next time you come to my house, you better have a search warrant and a body bag." (*Id.* at 292). Given the "totality of everything together," including Velez's behavior, Westrick took that statement to be a threat on his life. (*Id.*).

{¶51} Westrick and the officer assisting him, Sergeant Recker, placed Velez under arrest and transported him to the Putnam County Jail. (*Id.*). Westrick testified that during that transport, Velez continued to say things "referencing what goes around comes around." (*Id.*). According to Westrick, once they arrived at the jail, Velez "kept staring" at Westrick and said he wanted to remember what Westrick looked like. (*Id.* at 292-293). Westrick testified that shortly after that, Velez made reference to his being a pistol expert. (*Id.* at 293). According to Westrick, in addition to Velez's statements, his body language was confrontational. (*Id.*).

{¶52} On cross-examination, Westrick testified that Velez initially refused to sign the citation to acknowledge receiving it, but Westrick told him that he could be arrested for refusing to sign it. (*Id.* at 295-296). According to Westrick, it is "[n]ot very often" that people refuse to sign a citation, and he thinks everyone has signed once he told them that they could be arrested for not signing. (*Id.*). Westrick testified that he had been to Velez's house before September 28, 2012,

probably within the year preceding that date, but he did not arrest or cite Velez then, nor did Velez threaten him. (*Id.* at 297, 301). According to Westrick, at the time Velez made the "body bag" statement, he was seated in his vehicle, and Westrick and Recker, both armed, were on either side of Velez's vehicle. (*Id.* at 297-298). Westrick arrested Velez for menacing based on the "body bag" statement and considering his behavior before he made the statement. (*Id.* at 298).

{¶53} On re-direct examination, Westrick testified that before the "body bag" statement, Velez had exited his vehicle and approached Westrick's cruiser several times, which is a concern for an officer. (*Id.* at 301). Velez exited his vehicle even after Westrick instructed him to remain in his vehicle. (*Id.*).

{¶54} After Westrick concluded his testimony, State's Exhibits 1 through 10 were admitted into the record without objection from Velez. (*Id.* at 306-307). The State rested, and the defense moved for the admission of Defendant's Exhibits A, B, and C, which the trial court admitted, with Defendant's Exhibit A being admitted over the State's objection. (*Id.* at 307-308). At that point, Velez moved for acquittal pursuant to Crim.R. 29 as to Counts One and Two, which the trial court denied. (*Id.* at 309).

{¶55} The defense then called Velez as a witness. (*Id.* at 310). Velez testified that he served a tour of duty in Vietnam, after which he was discharged "[h]onorable medical." (*Id.* at 312). Velez said he suffers from posttraumatic

stress disorder ("PTSD"), bipolar disorder, and attention deficit disorder. (*Id.* at 312-313). He travels to Cincinnati three times a week where he receives outpatient treatment for relapse prevention, PTSD issues, and anger management. (*Id.* at 317). Velez has been with Sherry for a total of 12 years—they lived together for six years prior to getting married, and they have been married for six years. (*Id.* at 313). Velez was served with divorce papers by a deputy on October 11 or 12, 2012. (*Id.* at 314). When Velez returned from Texas in September 2012, there was no discussion of divorce; however, when he saw that his belongings were in boxes, he suggested marriage counseling or a dissolution. (*Id.* at 314-315). Velez testified that a pension, life insurance policies, and vehicles are all issues in the divorce action. (*Id.* at 315).

{¶56} Velez testified that on the morning of October 13, 2012, he woke up at about 9:30 or 9:45 a.m. (*Id.* at 318). Velez had been sleeping on the couch and Sherry in the master bedroom since he returned from Texas, and he had been served with divorce papers, so Velez asked Sherry "if she had been doing anything behind [his] back," and Sherry responded, "[N]o." (*Id.* at 318-319). At that point, Velez was in the kitchen cutting fajitas and baby back ribs for himself and his dogs, and he was planning on going to Advance Auto Parts. (*Id.* at 319, 328). Velez also asked Sherry if she would cosign with him for a vehicle, and she refused. (*Id.* at 323). According to Velez, when he returned from Texas, the

house payment and utilities were in Sherry's name alone, and she purchased extra life insurance on Velez, in addition to the $250,000 life-insurance policy of which Sherry was the beneficiary. (*Id.* at 324). Velez told Sherry that he wanted to see their prenuptial agreement. (*Id.* at 325).

{¶57} Velez testified that he left the house to go visit his mother next door, and when he returned, Sherry was in the shower. (*Id.*). According to Velez, he then told Sherry that he was going to borrow her SUV, which was purchased during their marriage, and her cellphone in case she needed anything while he was in Ottawa. (*Id.* at 326). He said he always took her cellphone when he left the house because his cellphone, along with his vehicle, was stolen in Texas, and they have three home telephones. (*Id.*). Velez—dressed in slippers, scrub pants, and a t-shirt and with his dogs in the vehicle and his fajita meat and baby back ribs on the luggage rack—went to Advance Auto Parts in Ottawa to get some parts for his truck. (*Id.* at 316, 328).

{¶58} When Velez made his purchase and walked out of Advance Auto Parts, law enforcement officers were awaiting and arrested him. (*Id.* at 316-317, 329-330). Westrick was there, which caused Velez alarm because a judge ordered Velez to stay away from Westrick. (*Id.* at 329-330). According to Velez, law enforcement officers initially told him he was arrested for domestic violence, but later told him it was felonious assault. (*Id.* at 330-331).

**{¶59}** Velez testified that he at no point took a knife and held it to Sherry's throat, nor did he grab, pull, or push her by her arm and take her upstairs. (*Id.* at 319, 335). He said he is disabled, cannot lift over 20 pounds, and uses a walking stick and pain killers. (*Id.*). Velez testified that he had his walking stick with him on September 28 and October 13, 2012. (*Id.* at 319-320). Velez also testified that he did not tell Sherry that she would bleed out in five minutes if he cut her jugular. (*Id.* at 321).

**{¶60}** As for the September 28, 2012 traffic stop, Velez testified that Westrick pulled him over for speeding. (*Id.* at 331). According to Velez, during the stop, he exited his vehicle twice, and Westrick asked him to get back into his vehicle each time, which Velez did. (*Id.* at 332-333). Velez testified that when Westrick asked him to sign the citation, Velez was "irate" and "angry" and initially refused, but then signed after Westrick told him he could be arrested for refusing to sign. (*Id.* at 331, 333). Velez acknowledged that he told Westrick to bring a warrant or a body bag next time he came to Velez's house but said that he was spouting off in anger and quickly denied making the statement to Westrick shortly after making it because he did not mean it. (*Id.* at 333-334). According to Velez, he did not mean to cause Westrick any harm. (*Id.* at 335). Velez testified that Westrick and Recker both had guns and that he did not have a gun—only a walking stick. (*Id.*).

{¶61} On cross-examination, the State questioned Velez concerning his military discharge. (*Id.* at 336-340). Velez testified he was honorably discharged from the military based on his being diagnosed with PTSD following an incident in which he chased his commanding officer out of Velez's "hooch" with a combat bayonet. (*Id.* at 340-342). According to Velez, his commanding officer charged him with insubordination, and he was diagnosed with and treated for PTSD before being discharged. (*Id.* at 340, 342).

{¶62} Velez admitted that he told Rosengarten—while being transported to the jail on October 13, 2012—that he made the "body bag" statement to Westrick on September 28, 2012 after Westrick threatened to "blow" him out of the car. (*Id.* at 355). Velez also admitted that the video of the September 28, 2012 traffic stop did not support Velez's assertion that Westrick threatened to blow him out of the car. (*Id.* at 355-356).

{¶63} According to Velez, he made the "body bag" statement in a fit of anger because Westrick had been to his house harassing him, three times in uniform and once in civilian clothes. (*Id.* at 356). When counsel for the State suggested that Westrick had been to Velez's house only one time ever before, Velez explained that he was belligerent with Westrick because Westrick did not issue a citation when Westrick went to Velez's house. (*Id.* at 356-357).

**{¶64}** Velez testified that he did not remember staring at Westrick and saying he did not want to forget what Westrick looked like, nor did Velez recall saying that he was a gun expert or that he could kill someone. (*Id.* at 357-359). Based on the statements he made in anger, Velez testified, "I guess I would be guilty of menacing. I didn't mean it at the time." (*Id.* at 359).

**{¶65}** Velez testified that he was "paranoid" when he returned from Texas after he saw extra life insurance had been purchased for him, men's deodorant that did not belong to him in the medicine chest, his belongings packed, and the utilities transferred out of his name and into Sherry's name. (*Id.* at 360-362). According to Velez, on the morning of October 13, 2012, he began preparing food using the kitchen carving knife, went to check on his mother, and then went to Ottawa. (*Id.* at 364).

**{¶66}** On re-direct examination, Velez testified that the incident with his commanding officer took place when Velez had just returned from Cambodia, where his best friend was shot and killed by a sniper. (*Id.* at 366-367). His commanding officer presented him with medals, but he was upset because he did not believe that the officer was looking out for his and the other soldiers' safety. (*Id.* at 341-342, 366-369). While Velez was in Texas, he was "[c]onstantly on the phone" with Sherry. (*Id.* at 367). Velez testified that after returning to Ohio in

September 2012, he planned to return to the VA Hospital in Cincinnati to resume his treatments once he got a vehicle. (*Id.*).

{¶67} After Velez testified, the defense rested. (*Id.* at 370). Counsel gave their closing arguments, and the trial court charged the jury. (*Id.* at 374-420). The jury found Velez guilty of Count One, felonious assault, and Count Three, menacing, but not guilty of Count Two, possession of cocaine. (*Id.* at 424).

{¶68} We first review the sufficiency of the evidence supporting Velez's felonious-assault and menacing convictions. *See State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). There was sufficient evidence supporting each element of felonious assault. The act of pointing a deadly weapon, such as a knife, at another, coupled with a threat that indicates an intention to use the weapon to cause harm, is sufficient evidence to sustain a conviction for felonious assault under R.C. 2903.11(A)(2). *State v. Henderson*, 10th Dist. Franklin No. 10AP-1029, 2011-Ohio-4761, ¶ 14, citing *State v. Mincy*, 1st Dist. Hamilton No. C-060041, 2007-Ohio-1316, ¶ 67 and *State v. Green*, 58 Ohio St.3d 239 (1991), syllabus; *State v. Ryan*, 10th Dist. Franklin No. 08AP-481, 2009-Ohio-3235, ¶ 34 (concluding that evidence of defendant's holding a knife to the victim's throat and making life-threatening statements was "sufficient evidence that, if believed, would convince the average mind beyond a reasonable doubt that appellant knowingly attempted to cause the victim physical harm by

means of a deadly weapon"); *State v. Smith*, 4th Dist. Pickaway No. 06CA7, 2007-Ohio-502, ¶ 39 (concluding the defendant's holding the victim at knifepoint, "coupled with his repeated threats to cause bodily harm constitute sufficient evidence from which a rational trier of fact could conclude, beyond a reasonable doubt, that [the defendant] committed felonious assault"); *State v. Wertz*, 5th Dist. Guernsey No. 98 CA 09, 1998 WL 817695, *3-4 (Oct. 30, 1998) (concluding that evidence of the defendant's putting knife to the victim's throat and threatening to cut the victim's throat or kill the victim was sufficient to support a conviction for felonious assault with a deadly weapon). *See also State v. Williams*, 2d Dist. Montgomery No. 21842, 2007-Ohio-6612, ¶ 17 ("For purposes of a felonious assault conviction, a knife is a deadly weapon if it is capable of inflicting death and if it is used as a weapon."), citing *State v. Berry*, 2d Dist. Montgomery No. 21037, 2006-Ohio-833, ¶ 8-10.

**{¶69}** Here, Sherry testified that Velez asked her if she was ready to die or afraid to die, and he pointed a 10-inch carving knife at her. (June 24-25, 2013 Tr., Vol. One, at 161-162). She said that the knife was within two feet of her. (*Id.* at 163). Sherry testified that once upstairs, while she was bringing out the boxes containing Velez's belongings, he came at her with the knife and said, "Are you afraid to die? I'm not." (*Id.* at 164). She testified that Velez "just kept threatening to do bodily harm to [her] and [her] family." (*Id.* at 165).

{¶70} Later, according to Sherry, Velez had a different knife—a four-inch, folding pocket knife—that he pointed at Sherry, telling her "how nice [her] jugular was and that it would take a quarter of an inch, and [she] would bleed out before the EMS was called and that he could burn the house down and nobody would know any different." (*Id.* at 166-167). Sherry testified that as Velez was threatening to use the knife on her, he pointed the knife at her so it was closer than a couple feet from her. (*Id.*). She also testified that Velez held a knife to her and asked her if she was ready to die a total of "[f]our or five times." (*Id.* at 168). In her statement to the authorities, Sherry said that Velez threatened her "verbally [and] with kitchen carving knife" and that, while holding the knife, Velez threatened to cut her jugular. (*Id.* at 187-188); (Defendant's Ex. B).

{¶71} Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Velez committed felonious assault. The evidence demonstrated that Velez knowingly pointed at Sherry knives capable of inflicting death while making threatening statements, suggesting that he would kill her by cutting her jugular so she would bleed out. This is sufficient evidence to support a felonious-assault conviction. *See Henderson*, 2011-Ohio-4761, at ¶ 14-15.

{¶72} The evidence was also sufficient to support each element of menacing. "'Generally, under the menacing laws, the state does not need to prove

the offender's ability to carry out the threat or any movement toward carrying it out.'" *State v. Ross*, 5th Dist. Coshocton No. 09-CA-0024, 2010-Ohio-2931, ¶ 19, quoting *State v. Collie*, 108 Ohio App.3d 580, 583 (1st Dist.1996). *See also State v. Seabeck*, 9th Dist. Summit No. 25190, 2011-Ohio-3942, ¶ 14-17 (concluding that there was sufficient evidence supporting the defendant's menacing conviction where the defendant was angry and belligerent toward the officer arresting him and stated, "When I beat this, I am going to make sure that I come out to Hudson and see you," which caused the officer to believe that the defendant would cause him physical harm).

{¶73} Here, Velez admitted on the stand that he told Westrick to bring a body bag next time he came to his house. (June 24-25, 2013 Tr., Vol. Two, at 354-355). The statement was captured on the video of Velez's September 28, 2012 traffic stop and arrest, and in the video of Velez's October 13, 2012 arrest, Velez can be heard telling Rosengarten that he made the "body bag" statement to Westrick. (State's Exs. 1, 9). Westrick testified that he took Velez's "body bag" statement to be a threat on his life. (June 24-25, 2013 Tr., Vol. Two, at 292). Velez was apparently aware of the gravity of his threatening statement to Westrick because he immediately denied making it and apologized. (*Id.* at 355); (State's Ex. 1).

**{¶74}** While Velez did not recall making all of the threatening statements he made to Westrick, he acknowledged that his threatening statements, reflected on the video of Velez's September 28, 2012 traffic stop and arrest, would cause someone to believe Velez was intent on hurting that person. (June 24-25, 2013 Tr., Vol. Two, at 357-359). Indeed, Westrick testified that he took these additional threatening statements as threats and that he believed Velez was "going to do something to [him] later on" and "follow through with something." (*Id.* at 293). Velez said that he made the threating statements in anger, and when counsel for the State asked him if he committed the crime of menacing, Velez responded, "I guess I would be guilty of menacing. I didn't mean it at the time." (*Id.* at 359).

**{¶75}** Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Velez committed menacing. The evidence demonstrated that Velez made threatening statements to Westrick that caused Westrick to believe that Velez would cause him physical harm. This is sufficient evidence to support a menacing conviction. *See Seabeck*, 2011-Ohio-3942, at ¶ 14-17.

**{¶76}** Having concluded that sufficient evidence supports Velez's convictions, we next address his argument that his convictions were against the manifest weight of the evidence. We begin with Velez's felonious-assault conviction. As we summarized in our discussion of the sufficiency of the

evidence above, Sherry testified that Velez made threatening statements to her while holding her at knifepoint. In addition, Nelson testified that Sherry was crying and very upset and afraid when he arrived at the Velez residence on October 13, 2012, and she was shaking as he took her statement. (June 24-25, 2013 Tr., Vol. Two, at 210-212). Settlemeyer testified that Sherry was very shaken up and ready to start crying after the incident on October 13, 2012 and that Sherry's version of that day's events has not changed. (*Id.* at 278-279).

**{¶77}** Velez attempted to discredit Sherry's version of the events of October 13, 2012. He testified that he at no point took a knife and held it to Sherry's throat. (*Id.* at 319, 335). He disputed Sherry's allegation to Nelson that Velez drug her up the stairs, arguing that he is disabled and cannot lift over 20 pounds. (*Id.* at 319). However, Velez's focus on the semantics of "drag" and "pull" ignores that Sherry both told Nelson and testified at trial that Velez grabbed her by the arm and, with a knife in his other hand, caused her to go upstairs. (*Id.* at 218); (June 24-25, 2013 Tr., Vol. One, at 163-164).

**{¶78}** Velez also argues that Sherry contradicted herself by testifying at trial that Velez threatened her with two knives, while not mentioning two knives during the investigation. It is true that Sherry's statement to the Putnam County Sheriff's Office does not mention the pocket knife; however, Nelson's narrative—prepared the day after the incident—references the "large carving knife" and the

"folding lock blade knife." (Defendant's Exs. B, C). Therefore, the record reflects that Sherry did mention both knives during the investigation.

**{¶79}** Velez argues that Sherry did not say in her statement that she built a "wall of protection" from the boxes, but she did at trial. These are not contradictory, as Nelson testified he observed several boxes in the patch room, some of which were stacked. (June 24-25, 2013 Tr., Vol. Two, at 214-215).

**{¶80}** Velez argues that Sherry's taking a shower during the incident suggests that Sherry was under no duress and that she is fabricating her story; however, Sherry testified that she showered because she was intent on gathering her belongings, getting out of the house, and going to work, despite Velez's threatening behavior. (June 24-25, 2013 Tr., Vol. One, at 166, 197).

**{¶81}** Velez argues that Sherry called family after the incident, rather than going to the nearby police station; however, Sherry testified that she did not first notify the police because she was afraid that Velez—who she said threatened to kill her in the past if she called the police on him—would retaliate against her. (*Id*. at 171).

**{¶82}** Velez points to Sherry's physical condition following the October 13, 2012 incident. He argues that she had no visible injuries, marks, or bruises and that her subsequent medical issues were caused by an unrelated abdominal blockage. These arguments ignore that actual injury or harm is not an essential

element of felonious assault under R.C. 2903.11(A)(2). *State v. Johnson*, 8th Dist. Cuyahoga No. 85862, 2005-Ohio-5852, ¶ 11 ("[F]elonious assault does not require an actual injury, it is enough that the defendant attempts to cause physical injury.").

{¶83} Velez's theory at trial and main argument in his brief is that Sherry was motivated to fabricate a story against Velez as part of a "plan" to divorce Velez and put herself in as favorable a financial position as possible. (*See* June 24-25, 2013 Tr., Vol. Two, at 392). Velez argues that Sherry transferred the utilities and marital residence and assets into her name, purchased a new car in her name, and purchased a life insurance policy on Velez's life. However, aside from Sherry authenticating her complaint for divorce, the testimony concerning Sherry's "plan" came from Velez, not the defense's cross-examination of Sherry.

{¶84} Velez's testimony concerning Sherry's "plan" was underwhelming compared to the evidence that Velez committed felonious assault. Indeed, while Sherry acknowledged that she was going through a divorce with Velez, she testified that her story was not fabricated and that she would have preferred that the incident not have occurred and that she did not have to testify. (June 24-25, 2013 Tr., Vol. One, at 175).

{¶85} For all of these reasons, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that the felonious-assault conviction must be reversed and a new trial ordered.

{¶86} We next address Velez's argument that his menacing conviction was against the manifest weight of the evidence. We explained above while addressing the sufficiency of the evidence supporting this conviction that Velez made threatening statements to Westrick, only the first of which he remembered making. Velez's main argument—that Velez meant by his "body bag" statement that he was contemplating suicide, so the next time Westrick came to Velez's house, he should bring a body bag for Velez—is disingenuous, at worst, and belied by the record, at best. Velez acknowledged that the statements he made to Westrick, as depicted on video, would cause someone to believe Velez was intent on hurting that person. (June 24-25, 2013 Tr., Vol. Two, at 357-359).

{¶87} The video shows Velez angrily pointing his finger at Westrick while making the "body bag" statement. (State's Ex. 1). While Rosengarten was transporting Velez to the jail following his October 13, 2012 arrest, Velez told Rosengarten how he was entitled to tell Westrick, "Next time you fuck with me, I'm going to put you in a body bag." (State's Ex. 9). Velez's argument is also belied by his attempt to deny making the "body bag" statement immediately after

making it. Velez's argument that the "body bag" statement was intended for him, not Westrick, fails to explain why he also told Westrick to bring a warrant.

{¶88} Velez's arguments that he uses a cane, was "trapped" and unarmed in his vehicle, and was surrounded by two officers with firearms, ignore the elements of menacing under R.C. 2903.22(A) and that the State was not required to prove Velez's "'ability to carry out the threat or any movement toward carrying it out.'" *Ross*, 2010-Ohio-2931, at ¶ 19, quoting *Collie*, 108 Ohio App.3d at 583.

{¶89} For all of these reasons, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that the menacing conviction must be reversed and a new trial ordered.

{¶90} Velez's second assignment of error is overruled.

### Assignment of Error No. I

**The trial court erred when it denied Defendant's motion for separate trials.**

{¶91} In his first assignment of error, Velez argues that the trial court erred by not granting his motion to sever Count Three from Count One for trial purposes. Specifically, he argues that Count Three, the menacing count, stemmed from a September 28, 2012 traffic stop during which Velez allegedly threatened a sheriff's deputy, and that Count One, the felonious assault count, stemmed from an incident at the residence of Velez and his wife, during which Velez allegedly held his wife at knifepoint. These counts, he says, occurred on different dates and

at different locations and involved different people and separate and distinct fact patterns.

**{¶92}** Crim.R. 8(A) permits the joinder of multiple charges against a defendant if the charges "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." "It is well settled that the law favors joinder * * *." *State v. Waddy*, 63 Ohio St.3d 424, 429 (1992), superseded by constitutional amendment as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997). *See also State v. Howard*, 3d Dist. Marion No. 9-10-50, 2011-Ohio-3524, ¶ 80. "The Ohio Supreme Court has further indicated that the joinder is to be 'liberally permitted.'" *State v. Rollins*, 3d Dist. Paulding No. 11-05-08, 2006-Ohio-1879, ¶ 42, citing *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992).

**{¶93}** "'A defendant claiming prejudice by the joinder of offenses may move for severance under Crim.R. 14.'" *State v. Bennett*, 9th Dist. Lorain No. 12CA010286, 2014-Ohio-160, ¶ 9, quoting *State v. Merriweather*, 9th Dist. Lorain No. 97CA006693, 1998 WL 239773, *3 (May 6, 1998). The defendant "'has the burden of making an affirmative showing that his rights will be prejudiced'" by joinder. *State v. Davis*, 9th Dist. Summit No. 26660, 2013-Ohio-5226, ¶ 40, quoting *State v. Roberts*, 62 Ohio St.2d 170, 175 (1980).

{¶94} When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine: (1) whether evidence of the other crimes would be admissible even if the counts were severed; and (2) if not, whether the evidence of each crime is simple and distinct. *Schaim*, 65 Ohio St.3d at 59, citing *State v. Hamblin*, 37 Ohio St.3d 153, 158-159 (1988). "If the evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials,' and a court need not inquire further." *Id.*, quoting *Drew v. United States*, 331 F.2d 85, 90 (C.A.D.C.1964).

{¶95} "[A] defendant's failure to renew his or her Crim.R. 14 motion for severance at the close of the State's case or at the close of all evidence waives all but plain error on appeal." *Howard*, 2011-Ohio-3524, at ¶ 82, citing *State v. Miller*, 105 Ohio App.3d 679, 691 (4th Dist.1995). "To demonstrate plain error, the defendant must demonstrate that the trial court deviated from a legal rule, the error was an obvious defect in the proceeding, and the error affected a substantial right." *Id.* at ¶ 83, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "The defendant must also demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors." *Id.*, citing *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996). "We recognize plain error 'with the utmost caution, under

exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.*, quoting *State v. Landrum*, 53 Ohio St.3d 107, 110 (1990).

**{¶96}** In this case, the trial court allowed Velez to file his untimely motion to sever but denied the motion. (June 24-25, 2013 Tr., Vol. One, at 5); (Doc. Nos. 107, 109). Velez failed to renew his motion to sever at the close of the State's case or at the close of all evidence, so we apply a plain-error standard of review and conclude that the trial court did not commit plain error by denying Velez's motion because the evidence of each offense was simple and distinct.

**{¶97}** As Velez acknowledges in his brief, the menacing and felonious-assault offenses took place on separate days, involved different victims and different circumstances, occurred at different locations, and had separate and distinct fact patterns. *See Rollins*, 2006-Ohio-1879, at ¶ 2, 45 (concluding that two different drug-related offenses that took place approximately six weeks apart, but were charged in the same indictment, were separate and distinct for purposes of joinder, so the defendant's trial counsel's failure to request separate trials did not rise to the level of ineffective assistance).

**{¶98}** Also as Velez acknowledges, because of the available videos demonstrating that Velez made the "body bag" and other threatening statements to Westrick, there was a "much greater availability of potentially corroborating evidence available for the menacing" offense. (Appellant's Brief at 10). As for

the felonious-assault offense, Sherry was the alleged victim, and the jury was presented with two uncomplicated, opposing stories concerning the events underlying that offense.

**{¶99}** The trial court instructed the jury that it was required to "consider each count and the evidence applicable to each count separately * * * uninfluenced by your verdict as to any other count." (June 24-25, 2013 Tr., Vol. Two, at 413). We presume that the jury followed that instruction. *State v. Hoffman*, 9th Dist. Summit No. 26084, 2013-Ohio-1021, ¶ 16. *See also State v. Artis*, 3d Dist. Logan No. 8-13-01, 2013-Ohio-3198, ¶ 8. Moreover, Velez "has not shown that the proof for an offense for which he was convicted would have been insufficient had [both counts] not been joined in the same trial." *Roberts*, 62 Ohio St.2d at 175.

**{¶100}** For these reasons, the trial court did not commit plain error by denying Velez's motion to sever.

**{¶101}** Velez's first assignment of error is overruled.

### Assignment of Error No. III

**The trial court erred when it allowed an impaired juror to remain.**

**{¶102}** In his third assignment of error, Velez argues that we should reverse his convictions and order a new trial because the trial court did not remove a juror who allegedly had difficulty hearing during the trial. Velez argues that trial court

abused its discretion when it decided not to ask the juror—who approached Velez's attorney at lunch at a nearby restaurant and said he was having difficulties hearing at the trial—whether the juror heard and understood the evidence and the trial court's instructions.

{¶103} "Crim.R. 24(G) and R.C. 2945.29 address removal of jurors during criminal trials." *State v. Cunningham*, 2d Dist. Clark No. 10-CA-57, 2012-Ohio-2794, ¶ 45. "R.C. 2945.29 permits a court to replace a juror with an alternate '[i]f, before the conclusion of the trial, [the original] juror becomes sick, or for other reason is unable to perform his duty.'" *State v. Hunt*, 10th Dist. Franklin No. 12AP-1037, 2013-Ohio-5326, ¶ 71, quoting R.C. 2945.29. Crim.R. 24(G) similarly provides, in part, "that alternate jurors 'shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties.'" *Cunningham* at ¶ 45, quoting Crim.R. 24(G)(1). Crim.R. 24(G)(1) also allows the court to replace a juror after deliberations have begun. *Hunt* at ¶ 71. "However, '[i]f an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.'" *Id.*, quoting Crim.R. 24(G)(1).

{¶104} "A trial judge is empowered to exercise 'sound discretion to remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty is impaired.'"

*Cunningham* at ¶ 46, quoting *State v. Lake*, 5th Dist. Richland No. 2009-CA-0011, 2010-Ohio-1113, ¶ 74. When a defendant fails to object to the trial court's decision to remove or retain a juror, the defendant waives for appeal all but plain error. *State v. Villarreal*, 12th Dist. Butler No. CA2004-02-035, 2005-Ohio-1924, ¶ 40; *State v. Brown*, 5th Dist. Richland No. 11 CA 42, 2012-Ohio-2672, ¶ 76.

{¶105} In this case, on the second day of trial, the trial court recessed for lunch after closing arguments but before charging the jury. (June 24-25, 2013 Tr., Vol. Two, at 399-401). After the luncheon recess, the trial court charged the jury, and the jury then retired to deliberate. (*Id.* at 401-420). After the jury retired to deliberate, the trial court allowed Velez's counsel to express a concern he apparently raised after the luncheon recess but before the trial court charged the jury. (*Id.* at 401, 420-422).

{¶106} Velez's counsel informed the trial court that "it appear[ed]" that Juror No. 10 "was having difficulties in hearing" "during the course of the trial and specifically * * * when the [trial court] was giving the jury its charge." (*Id.* at 420). Velez's counsel explained that while he was at lunch at a local restaurant, Juror No. 10 attempted to engage him in conversation, at which time Velez's counsel "waved him off" and told him he could not speak with him. (*Id.* at 421). At the same time, the juror told Velez's counsel that "he wanted to know [Velez's counsel's] name because he couldn't hear or was having difficulties hearing * *

\*." (*Id.*). Velez's counsel requested that the trial court "inquire to make sure that [Juror No. 10] has heard and understood everything \* \* \*." (*Id.* at 420).

{¶107} The trial court responded to Velez's counsel's request by explaining that it had already asked the jurors whether any of them had difficulty in following the trial court's instructions:

> And the request for any additional inquiry was limited to the [trial court's] question to the panel as a whole whether or not anyone has had any difficulty in following the instructions; and having no response from either Juror No. 10 or any other member of the panel, the [trial court] does not feel it's necessary to conduct any further inquiry.

(*Id.* at 421-422). Velez's counsel did not object to the trial court's decision to retain Juror No. 10. (*See id.* at 422).

{¶108} After the luncheon recess but before charging the jury, the trial court asked the jury, "I would first of all ask whether any of the jurors have had any difficulty in following the instructions of the [trial court] concerning discussion or contact about the case; and if so, please raise your hand." (*Id.* at 402). No juror raised his or her hand. (*See id.*). The trial court asked essentially the same question when the jury returned from recesses throughout the trial.

**{¶109}** During voir dire, the trial court asked the prospective jurors, including eventual Juror No. 10, whether they had any health issues that would affect their ability to serve on the jury:

[Trial Court]:     Does everyone here or does anyone here have any health problems that you feel are so difficult that you would have difficulty being a juror in a trial lasting today and through probably tomorrow? Does anyone have any health problems, inability to sit or any other health issues that you feel would cause you difficulties?

\* \* \*

[Trial Court]:     Good morning, [Juror No. 10]. Are you presently a resident of Putnam County?

[Juror No. 10]:   Yes.

[Trial Court]:     All right. Anyone have any other health issues that you feel would cause you difficulty?

[Juror No. 10]:   I just don't hear very good, Your Honor.

[Trial Court]:     All right. And if there are times that you do not hear, you can simply ask that it be repeated. When a witness is testifying, there is a microphone set up.

I'm presently not using a microphone. Are you able to hear me?

[Juror No. 10]: (Juror nods head.)

[Trial Court]: Yes? All right.

[Juror No. 10]: Yes.

[Trial Court]: And if anyone else has any difficulties in hearing either witnesses or attorneys, simply raise your hand, we'll make sure it is repeated so that you're able to hear everything that happens.

(June 24-25, 2013 Tr., Vol. One, at 18-19, 23-24).

{¶110} Velez's counsel requested that the trial court ask Juror No. 10 whether he "heard and understood everything." The trial court declined to do so and decided to retain Juror No. 10. Velez's counsel did not object, so we apply plain-error review. We conclude that the trial court did not commit plain error by not conducting additional inquiry of Juror No. 10 or by retaining Juror No. 10.

{¶111} During voir dire, the trial court instructed the prospective jurors to raise their hands if they could not hear. (*Id.* at 23-24). Juror No. 10 indicated that he could hear the trial court judge, who was not using a microphone, when the trial court during voir dire asked him if he could hear. (*Id.* at 24). Aside from Juror No. 10 asking Velez's counsel his name at lunch, nothing in the record suggests

Juror No. 10 had any difficulty following the trial court's instruction to raise his hand if he could not hear. For these reasons, the trial court did not commit plain error.

{¶112} Velez's third assignment of error is overruled.

**Assignment of Error No. IV**

**The trial court erred by allowing the introduction of hearsay documents and statements arising from those documents particularly as the statements relate to prior bad acts and character of Appellant.**

{¶113} In his fourth assignment of error, Velez argues that the trial court erred by allowing the State to cross-examine Velez concerning his honorable medical discharge from the military and the circumstances leading to it. Specifically, Velez argues that the State exceeded the scope of direct examination and elicited improper character evidence, that the testimony was more prejudicial than probative, that the State introduced hearsay and unauthenticated documents, and that the trial court did not properly instruct the jury "on how to handle such evidence." (Appellant's Brief at 24).

{¶114} "It is well established that the decision to admit or exclude evidence is within the sound discretion of the trial court and that an appellate court will not disturb that decision absent an abuse of discretion." *State v. Smith*, 197 Ohio App.3d 742, 2012-Ohio-532, ¶ 15 (3d Dist.), citing *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus and *State v. Swann*, 119 Ohio St.3d 552,

2008-Ohio-4837, ¶ 33. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). However, when a defendant fails to object to the admission of evidence at trial, he waives for appeal all but plain error. *State v. Brooks*, 3d Dist. Defiance No. 4-08-09, 2008-Ohio-6188, ¶ 12, citing *State v. Welch*, 3d Dist. Wyandot No. 16-06-02, 2006-Ohio-6684, ¶ 16.

{¶115} On Velez's direct examination, his counsel asked him about his discharge from the Army:

[Velez's Counsel]: Have you ever been in the military?

[Velez]: Yes, sir. I enlisted – I graduated out of Leipsic Local in 1969, and I enlisted in the United States Army December 17th of 1969. Served a tour of duty in Vietnam 1970-71 after my boot camp at AIT.

[Velez's Counsel]: When did you leave the military?

[Velez]: July of '71.

[Velez's Counsel]: And what was your discharge?

[Velez]: Honorable medical.

[Velez's Counsel]: All right. So there was a medical discharge as well?

[Velez]:            Yes, sir.

(June 24-25, 2013 Tr., Vol. Two, at 312).  Velez's counsel then asked Velez about what he suffered from, and Velez explained that he suffers from PTSD, bipolar disorder, and attention deficit disorder.  (*Id.* at 312-313).

{¶116} Before the State's cross-examination of Velez, and out of the hearing of the jury, the State requested permission to ask Velez about his military background, "and specifically about an incident wherein he pulled a bayonet on a commanding officer," arguing that Velez opened the door by testifying to his military service and his honorable medical discharge.  (*Id.* at 336).  Velez's counsel objected.  (*Id.* at 336-340).  The trial court decided to allow "limited inquiry * * * as to the basis of the medical discharge," but said it was "inclined" to disallow questions concerning "the specifics about pulling the bayonet on the commanding officer."  (*Id.* at 338-339).  The trial court said, "I will rule on any objections at that point that are made by defense."  (*Id.* at 339-340).

{¶117} On cross-examination, the State asked Velez about his military service and about the incident with his commanding officer:

[State's Counsel]: And you indicated that at some point during your

                   time in the military, you were honorably

                   discharged?

[Velez]:            Correct.

[State's Counsel]: And that was based on some sort of diagnosis of Posttraumatic Stress Disorder?

[Velez]: Right, yes, sir.

[State's Counsel]: And isn't it true, however, that part of your discharge included an incident with a commanding officer?

[Velez]: That's correct.

[State's Counsel]: And what was that incident?

[Velez]: He came in to throw some metals [sic] on my bunk. One was from a purple heart, Army commendation with "V" device for valor. I pulled a lieutenant, we were under fire, both of us. And the other one was for a campaign medal that is – to this day these were deleted off of my file, it says "unknown" in parenthesis. Richard Nixon was in office at the time, we went into Cambodia, 27 and 29 miles into Cambodian border, behind the Cambodian border.

[State's Counsel]: Sir, my question was, didn't your discharge include an incident with an [sic] commanding officer?

[Velez]: I was charged with insubordination. My commanding officer said I was not fit to wear the uniform. My best friend had just got shot in the head. He was concerned more with body count than with our safety.

[State's Counsel]: And what did you do to this commanding officer?

[Velez]: I chased him out of my hooch. I told him to stick those medals where the sun didn't shine.

[State's Counsel]: And what did you chase him with?

[Velez]: With a combat bayonet. It was in 1970, sir.

(*Id.* at 340-342). At no point during that line of questioning did the defense object. (*See id.*).

**{¶118}** We first address Velez's argument that trial court allowed the State to go beyond Velez's direct examination and elicit improper character evidence under Evid.R. 404. Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion * * *." Evid.R. 404(A). However, there are

exceptions to that general rule. One exception allows the admission of "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same * * *." Evid.R. 404(A)(1). *See also State v. Bozeman*, 12th Dist. Butler No. CA2008-10-248, 2009-Ohio-3677, ¶ 39. Character evidence offered under Evid.R. 404(A)(1) "must bear reference to the nature of the charge or, in other words, be confined to such traits of character that are inconsistent with commission of the alleged offense." *Toledo v. Schmiedebusch*, 192 Ohio App.3d 402, 2011-Ohio-284, ¶ 39 (6th Dist.) (citations omitted).

{¶119} In other words, Evid.R. 404(A)(1) allows a defendant to "'offer evidence of his good character as proof that he did not commit the act charged because such conduct is not in accord with his character[,]'" but if he does, "'the prosecution [may] offer evidence of the bad character of the accused.'" *State v. Jacobs*, 4th Dist. Gallia No. 03CA24, 2004-Ohio-3393, ¶ 20, quoting Gianelli and Snyder, *Evidence*, at 229 (1996). "By introducing such evidence, the defendant 'opens the door' for the prosecution, which is then permitted to rebut or impeach the character evidence on cross-examination." *Id.*, citing Evid.R. 405(A) and *State v. Grubb*, 111 Ohio App.3d 277 (2d Dist.1996).

{¶120} Before Velez's cross-examination began, his counsel objected to the State's questioning him about his military discharge and the bayonet incident. The

trial court allowed the State a "limited inquiry" into Velez's medical discharge and said it would rule on specific objections raised by the defense. The trial court's decision to allow the State to question Velez concerning his medical discharge was not an abuse of discretion. In his direct examination, Velez testified to his "honorable medical" discharge—the circumstances of which were left unclear—so questions on cross-examination concerning his military discharge fit squarely within the scope of Velez's direct testimony.

{¶121} Velez's counsel did not object to any of the specific questions asked by the State on cross-examination concerning Velez's military history and the bayonet incident. The trial court did not commit plain error by allowing those questions or Velez's responses. By testifying in his direct examination that he was honorably discharged for medical reasons, Velez introduced evidence concerning pertinent character traits—namely, orderliness and peacefulness. These are pertinent traits of character to the offenses of felonious assault and menacing because those traits are inconsistent with the commission of those offenses. *See Schmiedebusch*, 192 Ohio App.3d 402, at ¶ 39; *Grubb* at 280. Therefore, under Evid.R. 401(A)(1), the State was allowed "to rebut the same" character traits by eliciting testimony from Velez concerning the circumstances of his military discharge, which included the bayonet incident. *See Jacobs* at ¶ 20-21.

{¶122} We next address Velez's argument that the trial court erred by allowing evidence of the bayonet incident because it was more prejudicial than probative. Under Evid.R. 403(A), "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *See State v. Maag*, 3d Dist. Hancock Nos. 5-03-32 and 5-03-33, 2005-Ohio-3761, ¶ 71. "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *State v. Calhoun*, 11th Dist. Ashtabula No. 2010-A-0057, 2012-Ohio-1128, ¶ 82.

{¶123} We concluded above that it was not plain error for the trial court to allow the State to ask questions concerning Velez's military history and the bayonet incident. Indeed, the testimony was properly elicited as rebuttal testimony under Evid.R. 404(A)(1) and, therefore, could not have resulted in an improper basis for a jury decision. In other words, it was not unfairly prejudicial to Velez for the State to introduce rebuttal evidence that it was, by Evid.R. 401(A)(1), allowed to introduce.

{¶124} Velez also argues that the testimony elicited in rebuttal by the State in its cross-examination was based on hearsay and unauthenticated documents. Velez is incorrect. The State did not attempt to introduce extrinsic evidence when it cross-examined Velez concerning his discharge from the Army. Rather, the

evidence was introduced in the form of testimony by Velez. That the State may have learned about the bayonet incident by a diagnostics report submitted to the trial court was of no legal significance. (*See* June 24-25, 2013 Tr., Vol. Two, at 338).

{¶125} Finally, we address Velez's argument that the trial court failed to properly instruct the jury "on how to handle" the evidence of Velez's military discharge, including the bayonet incident. Velez's argument ignores that "the precise wording of Evid.R. 404(A)(1) indicates that such evidence can in fact come in substantively"—in other words, "to show action in conformity" with the character trait. *Bozeman*, 2009-Ohio-3677, at ¶ 45. Accordingly, there was no need for a limiting instruction.

{¶126} Velez's fourth assignment of error is overruled.

{¶127} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**