[Cite as *State v. Jackson*, 2019-Ohio-170.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 13-18-18

    v.

KAREEM T. JACKSON,                **O P I N I O N**

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 17 CR 0174

**Judgment Affirmed**

**Date of Decision: January 22, 2019**

APPEARANCES:

    *Alex K. Treece* **for Appellant**

    *Derek W. DeVine* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Kareem T. Jackson ("Jackson"), appeals the April 13, 2018 conviction and May 23, 2018 judgment of sentence of the Seneca County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case arises from a September 27, 2017 incident in which Jackson allegedly broke into the house he used to share with Renae Fearing ("Fearing"), his estranged girlfriend, threw her cellular telephone at the wall while she attempted to call law enforcement, struck her repeatedly, and stole her money. (Apr. 12-13, 2018 Tr., Vol. I, at 98-99).

{¶3} On September 27, 2017, a felony complaint was filed in the Tiffin Municipal Court charging Jackson with a single count of domestic violence in violation of R.C. 2919.25(A), a third-degree felony. (Doc. No. 1). At the preliminary hearing on October 3, 2017, the municipal court found probable cause that an offense was committed by Jackson, and the matter was transferred to the Seneca County Court of Common Pleas. (*Id.*). On October 11, 2017, the Seneca County Grand Jury indicted Jackson on three counts: Count One of domestic violence in violation of R.C. 2919.25(A), (D)(4), a third-degree felony; Count Two of robbery in violation of R.C. 2911.02(A)(2), (B), a second-degree felony; and Count Three of disrupting public services in violation of R.C. 2909.04(A)(3), (C), a

fourth-degree felony. (Doc. No. 2). The parties stipulated to Jackson's five previous domestic-violence convictions prior to trial. (Doc. No. 39).

{¶4} The case proceeded to a jury trial on April 12 and 13, 2018. (Doc. No. 47). At the close of the State's case, Jackson made a motion for acquittal under Crim.R. 29, which was overruled by the trial court. (Apr. 12-13, 2018 Tr., Vol. I, at 196-197). On April 13, 2018, the jury found Jackson guilty of domestic violence and disrupting public services, but found Jackson not guilty of robbery. (Doc. Nos. 47, 48, 49, 50, 51); (Apr. 12-13, 2018 Tr., Vol. II, at 275). The trial court ordered a presentence investigation. (Doc. No. 47); (Apr. 12-13, 2018 Tr., Vol. II, at 277). On April 13, 2018, the trial court filed its judgment entry of conviction. (Doc. No. 47).

{¶5} On May 22, 2018, the trial court sentenced Jackson to 36 months in prison on Count One and 18 months in prison on Count Three and ordered that Jackson serve the sentences concurrently. (Doc. No. 55); (May 22, 2018 Tr. at 8). On May 23, 2018, the trial court filed its judgment entry of sentence. (Doc. No. 55).

{¶6} Jackson filed his notice of appeal on May 31, 2018. (Doc. No. 58). He raises two assignments of error for our review, which we address together.

**Assignment of Error No. I**

**The verdict of the trial court was against the sufficiency of the evidence as the state failed to prove each element of the offense beyond a reasonable doubt.**

**Assignment of Error No. II**

**The verdict of the trial court was against the manifest weight of the evidence when the credibility of the State's only witness was in question.**

**{¶7}** In his assignments of error, Jackson argues that his domestic-violence and disrupting-public-services convictions are based on insufficient evidence and are against the manifest weight of the evidence.

**{¶8}** Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). As such, we address each legal concept individually.

**{¶9}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, s*uperseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{¶10} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v.*

*Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶11} Jackson was convicted of domestic violence in violation of R.C. 2919.25(A), which provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Therefore, to find Jackson guilty of domestic violence in violation of R.C. 2919.25(A), the State was required to prove beyond a reasonable doubt that he "(1) knowingly caused or attempted to cause, (2) physical harm, (3) to a family or household member." *State v. Miller*, 3d Dist. Seneca No. 13-12-52, 2013-Ohio-3194, ¶ 29. Jackson does not dispute Fearing's status as a family or household member. (Appellant's Amended Brief at 5). Accordingly, our analysis will focus on the first two elements of the offense.

{¶12} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "'When determining whether a defendant acted knowingly, his state of mind must be determined from the totality of the circumstances surrounding the alleged crime.'" *State v. Valladares*, 3d Dist. Allen No. 1-17-49, 2018-Ohio-1250, ¶ 20, quoting *State v. Ingram*, 10th Dist. Franklin No. 11AP-1124, 2012-Ohio-4075, ¶ 22. Culpable mental states are frequently established through circumstantial evidence.

*Id.*, citing *Ingram* at ¶ 22. "[W]hether a person acts knowingly can only be determined, absent a defendant's admission, from all the surrounding facts and circumstances, including the doing of the act itself." *Miller* at ¶ 30, quoting *State v. Huff*, 145 Ohio App.3d 555, 563 (1st Dist.2001), citing *State v. Adams*, 4th Dist. Ross No. 94 CA 2041, 1995 WL 360247, *4 (June 8, 1995). "'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶13} In addition, Jackson was convicted of disrupting public services in violation of R.C. 2909.04(A)(3), which provides, "No person, purposely by any means or knowingly by damaging or tampering with any property, shall * * * [s]ubstantially impair the ability of law enforcement officers, firefighters, rescue personnel, emergency medical services personnel, or emergency facility personnel to respond to an emergency or to protect and preserve any person or property from serious physical harm."

{¶14} "The language in R.C. 2909.04(A)(3) is clear in that it prohibits (1) conduct that substantially impairs the ability of emergency-services personnel (2) to either respond to an emergency or protect and preserve any person or property from serious physical harm." *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 23. "The statute unambiguously specifies that in order for one to disrupt

public services under R.C. 2909.04(A)(3), the conduct involved must be the knowing damaging of or tampering with any property." *Id.*

{¶15} "'Property' means any property, real or personal, tangible or intangible, and any interest or license in that property. 'Property' includes, but is not limited to, * * * telecommunications devices * * *." R.C. 2901.01(A)(10)(a). "Telecommunications device" is defined as "any instrument, equipment, machine, or other device that facilitates telecommunication, including, but not limited to, a * * * telephone [or] cellular telephone * * *." R.C. 2913.01(Y).

{¶16} In addition, under R.C. 2909.04(A)(3), a person can be guilty of disrupting public services if they purposely substantially impair the ability of emergency services personnel to respond to an emergency or to protect and preserve any person or property from serious physical harm by any means. "A person acts purposely when it is the person's specific intention to cause a certain result * * *." R.C. 2901.22(A)

{¶17} At trial, the State first offered the testimony of Fearing. (Apr. 12-13, 2018 Tr., Vol. I, at 107). Fearing testified that Jackson moved into her house in March 2017 and that the two were romantically involved and shared living expenses. (*Id.* at 109). She stated that on September 26, 2017, she sent a text message to Jackson ending their relationship, informing Jackson that she put his belongings on the porch of her house for him to retrieve, and requesting that Jackson

"not come back" to her house. (*Id.* at 111). Fearing then identified State's Exhibit 1 as a copy of the text messages exchanged between Fearing and Jackson on the evening of September 26, 2017. (*Id.* at 111-112). State's Exhibit 1 includes text messages sent from Fearing to Jackson informing him that his personal belongings are on the porch and that Fearing does not desire a relationship with Jackson and requesting that he "[t]ake [his] things and leave." (State's Ex. 1). Fearing also told Jackson, "If you attempt to return or have any contact with me in person, via phone or otherwise I will contact the police * * *." (*Id.*). Fearing stated that in the weeks preceding the incident she had observed "warning signs" causing her to be fearful of Jackson. (Apr. 12-13, 2018 Tr., Vol. I, at 122).

{¶18} Fearing testified that she woke up on the morning of September 27, 2017 to Jackson "pounding" on the doors and knocking on the window. (*Id.* at 112-113). At first, she attempted to ignore the knocking, as Jackson had come to her house and knocked on the doors the night before and eventually left when she did not answer the door. (*Id.* at 113). Fearing stated that she then heard a noise that "sounded like a door busted in." (*Id.* at 113, 120).

{¶19} Fearing testified that prior to the incident on the morning of September 27, 2017, her back door was functional and able to be shut and locked and that following the incident, she could no longer shut or lock the back door. (*Id.* at 120). Fearing then identified State's Exhibit 4 as a photo of the doorframe of the back

door of Fearing's home following the incident on September 27, 2017. (*Id.* at 120-121). State's Exhibit 4 depicts a splintered doorframe. (State's Ex. 4).

{¶20} When she heard the sound of the door opening, Fearing picked up her cellular telephone to call 911. (Apr. 12-13, 2018 Tr., Vol. I, at 113). Fearing testified that as she was putting her passcode in to unlock her phone, Jackson came into her bedroom, threw Fearing's cellular telephone against the wall, and began striking her. (*Id.*). Fearing stated that Jackson hit her on her face, arms, and ribs with his fist while she yelled loudly, trying to get the attention of her roommate who Fearing later learned was not at home during the incident. (*Id.* at 113-115). Fearing testified that Jackson told her to "shut the * * * fuck up or he would kill [her]." (*Id.* at 115). Fearing stated that Jackson searched through her purse, took her cash, and left the house. (*Id.* at 116).

{¶21} Fearing stated that after Jackson left the house, she went outside so she could call the police from her neighbors' house because she could not locate her cellular telephone. (*Id.* at 117). When Fearing reached her porch, her neighbor, Angela Brengartner ("Angela") was outside and upon seeing Fearing, asked her if she was okay and if Jackson had hit her. (*Id.* at 118). Fearing testified that Angela yelled inside her house, asking her husband, Gene Brengartner ("Gene"), to call the police, but he already had law enforcement on the phone. (*Id.*).

{¶22} Fearing testified that as a result of the physical confrontation with Jackson, she had red marks and a bump on her face, bumps on her arms, and red marks on her ribs. (*Id.* at 119).   Fearing identified Jackson in open court as the individual who inflicted the injuries on her. (*Id.* at 114).  Fearing then identified State's Exhibits 2 and 3 as photographs of her arm following the physical confrontation with Jackson. (*Id.* at 119-120).  State's Exhibit 2 depicts Fearing's left arm with bruising and some swelling. (State's Ex. 2).  State's Exhibit 3 is a closer photo of Fearing's left arm with a pen held up against her arm to demonstrate the extent of the swelling at the site of the bruise. (State's Ex. 3).  Fearing described her injuries as "serious but not severe" and denied receiving medical treatment for her injuries. (Apr. 12-13, 2018 Tr., Vol. I, at 121).

{¶23} On cross-examination, Fearing identified Defendant's Exhibit A, which depicts Jackson's belongings set out on Fearing's porch. (*Id.* at 123); (Defendant's Ex. A).  Fearing testified that she put Jackson's belongings on the porch on September 26, 2017 prior to sending Jackson the text message ending their relationship. (Apr. 12-13, 2018 Tr., Vol. I, at 124).

{¶24} Jackson's trial counsel reviewed State's Exhibit 4 with Fearing who stated that she found a missing metal piece from her splintered doorframe on the floor in her home following the alleged incident. (*Id.* at 126-127).   Fearing identified Defendant's Exhibits F and G as photographs of Fearing's ribcage and

right side which purport to depict bruising inflicted during the physical confrontation. (*Id.* at 127-128); (Defendant's Exs. F, G). Fearing stated that she was on crutches for a sprained ankle at the time of the incident, but denied receiving any bruises or abrasions on her arm and elbow when she sustained her ankle injury. (Apr. 12-13, 2018 Tr., Vol. I, at 129).

{¶25} Fearing identified Defendant's Exhibits H, I, J, and K as a series of photographs depicting Fearing's cellular telephone following the alleged incident. (*Id.* at 131-134). Defendant's Exhibit H depicts Fearing's phone with the back cover of the phone missing but with the internal battery still intact. (Defendant's Ex. H). Defendant's Exhibit I depicts Fearing's phone between her window and the headboard of her bed–the location it was found following the incident. (Defendant's Ex. I). Defendant's Exhibit J depicts the back cover of Fearing's phone in the location it was recovered following the incident, on her bedroom floor near her bed. (Defendant's Ex. J). Defendant's Exhibit K is a photo of the front of Fearing's phone following the incident with the screen intact but with a small piece of the upper left corner of the phone missing. (Defendant's Ex. K). Fearing testified that she located her phone between the headboard of her bed and her windowsill following the incident when her friend called her phone and the phone rang, allowing her to better ascertain its location. (Apr. 12-13, 2018 Tr., Vol. I, at 133-134).

{¶26} Fearing identified Defendant's Exhibit L as a copy of the petition and order granting Fearing a domestic violence civil protection order against Jackson on September 29, 2017. (*Id.* at 136-138). Defendant's Exhibit L includes a statement, written by Fearing several days after the incident stating that she was struck by Jackson "in the face, arm, neck, [and] ribs." (Defendant's Ex. L). (*See* Apr. 12-13, 2018 Tr., Vol. I, at 137).

{¶27} Fearing also identified Defendant's Exhibit M as a copy of the written statement Fearing gave to the police in the immediate aftermath of the incident on September 27, 2017 where she stated she was struck in the "face, arm, and ribs," but did not state that she was struck in the neck. (Apr. 12-13, 2018 Tr., Vol. I, at 138-139); (Defendant's Ex. M). Upon review of Defendant's Exhibits L and M, Fearing admitted that there were "some differences" between the two documents. (Apr. 12-13, 2018 Tr., Vol. I, at 139).

{¶28} On re-direct examination, Fearing stated that she did not include certain details in both statements because she "didn't think to put it in the statement" and "[d]idn't think it was pertinent." (*Id.* at 141).

{¶29} Next, the State offered the testimony of Gene, Fearing's next-door neighbor. (*Id.* at 142-143). Gene testified that on the morning of September 27, 2017 he was drinking coffee inside his house when he "heard a bunch of banging and noise." (*Id.* at 144). Gene alerted his wife to the noise, went outside, and saw

Jackson outside Fearing's house. (*Id.* at 144-145). Gene stated that he "told [Jackson] he's making a lot of noise and waking people up." (*Id.* at 144). Jackson apologized and Gene went back into his house. (*Id.*). Although Gene did not know Jackson by name at the time of the encounter, Gene recognized Jackson as Fearing's "boyfriend on and off" and had seen Jackson previously at Fearing's house. (*Id.* at 145).

{¶30} Gene testified that when he returned to his house, he sent his wife, Angela, to knock on Fearing's door to check on her because "something didn't seem right." (*Id.*). Gene stated that Angela went to check on Fearing and returned to the house to tell him that Jackson had answered the door and told her that Fearing was sleeping. (*Id.*). After Angela reported her encounter with Jackson, Gene stated that Angela went back outside to smoke a cigarette. (*Id.* at 145-146). Gene testified that Angela came back inside and told him that she heard someone screaming and asked him to call the police. (*Id.* at 146). Gene stated that several minutes later, Fearing knocked on the door. (*Id.*). Gene testified that Fearing "looked like she had been beat[en] up" and had bruises on her face. (*Id.* at 146-147). Gene stated that Fearing stayed at his house while waiting for law enforcement to arrive. (*Id.* at 147).

{¶31} On cross-examination, Gene stated that on the morning of September 27, 2017 he saw Jackson exit Fearing's house to put a shoe box on the front porch and then reenter the house. (*Id.* at 148). Gene testified that he gave a written

statement when the police arrived and that Fearing was not present when he gave his statement to the police. (*Id.* at 149-150).

**{¶32}** The State's next witness, Angela, Gene's wife, testified that on the morning of September 27, 2017, she awoke to her husband telling her he heard a noise outside and asking her to investigate. (*Id.* at 151-152). Angela stated that she saw a person at Fearing's house while she was outside smoking a cigarette, but she initially assumed he lived at the house and was returning from work. (*Id.* at 153). Angela testified that upon Gene's request, she walked over to Fearing's house and knocked on the door. (*Id.* at 154). Angela stated that nobody answered the door right away, so she continued to knock. (*Id.*). Eventually, Jackson answered the door and told Angela that Fearing was sleeping. (*Id.*). Angela stated that she told Jackson to tell Fearing to come and see Gene when she wakes up. (*Id.* at 154-155). Angela identified Jackson in open court as the individual that answered Fearing's door on the morning of the incident. (*Id.*).

**{¶33}** Angela stated that she returned to her home following her interaction with Jackson and that, shortly thereafter, she stepped outside her house to smoke another cigarette. (*Id.* at 155-156). Angela testified that while she was outside she "heard screaming and crying" coming from Fearing's house and that she went back into her house and asked Gene to call the police. (*Id.*).

{¶34} Angela testified that when she returned to Fearing's house, Fearing was outside acting "choke[d] up [and] scared" and told her that Jackson hit her and stole her money. (*Id.* at 156). Angela stated that Fearing stayed at Angela's house while waiting for the police to arrive. (*Id.* at 156-157).

{¶35} On cross-examination, Angela identified Defendant's Exhibit N as a copy of the written statement Angela made to the police immediately following the incident. (*Id.* at 157). Angela admitted that she did not include her interaction with Jackson in the report because she was "shook up" in the aftermath of the incident and did not remember her encounter with Jackson until later. (*Id.* at 157-158). (*See* Defendant's Ex. N). Angela stated that she had never spoken to or seen Jackson prior to the day of the incident and that she had a friendly, "neighborly" relationship with Fearing. (Apr. 12-13, 2018 Tr., Vol. I, at 159-160).

{¶36} The State's next witness was Suzanne Brengartner ("Suzanne"), Gene and Angela's adult daughter, who lives with her parents in the house next door to Fearing. (*Id.* at 161-162). Suzanne described her relationship with Fearing as "just a neighbor" and stated that while they have conversations occasionally, they do not have a close relationship. (*Id.* at 163). Suzanne testified that on the morning of September 27, 2017, she got out of bed to use the bathroom when she heard banging coming from Fearing's house. (*Id.* at 163-164). Suzanne looked out the bathroom window, which overlooks Fearing's porch, and saw Jackson "banging on the door."

(*Id.*). Suzanne recognized Jackson as living next door with Fearing, and because she assumed he forgot his keys and wanted in the house, Suzanne went back to bed without further investigation. (*Id.* at 164). Suzanne did not know the name of the man that she saw banging on Fearing's door, but she identified Jackson in open court as the person she saw on the day of the incident. (*Id.* at 164-165). Suzanne stated that after she went back to bed, she was unable to fall back asleep because she "kept hearing things" so she went to the window and saw Jackson walking to the back of Fearing's house. (*Id.* at 165-166). Following the incident, Suzanne caught a glimpse of Fearing walking to Suzanne's house but did not directly interact with Fearing. (*Id.* at 167).

{¶37} On cross-examination, Suzanne stated that although she had never interacted with Jackson, she knew that he lived in Fearing's house because she had seen him enter the house on previous occasions. (*Id.* at 169). Suzanne then identified Defendant's Exhibit O as a copy of the written statement Suzanne made to the police immediately following the incident. (*Id.* at 170-172). (*See* Defendant's Ex. O).

{¶38} Finally, Sergeant Robert Bour ("Sgt. Bour"), a road patrol sergeant with the Tiffin Police Department, testified that he was dispatched to Fearing's house on the morning of September 27, 2017. (Apr. 12-13, 2018 Tr., Vol. I, at 173-176). Sgt. Bour described Fearing as being "distraught" when he encountered her

and stated that Fearing told him that her estranged boyfriend, Jackson, broke into her home, physically assaulted her, took money from her, and fled. (*Id.* at 176-177). Sgt. Bour recalled that Fearing told him that she was struck in the "face, arms[,] and ribs area" and that when Fearing asked Jackson why he was assaulting her he told her, "Shut the fuck up or I will kill you." (*Id.* at 177-178). Sgt. Bour described observing bruising on Fearing's arms as depicted in State's Exhibits 2 and 3. (*Id.* at 178-179). Sgt. Bour indicated that the injuries he observed on Fearing's body "appeared to * * * have just happened" due to the swelling at the site of the wound, which in Sgt. Bour's personal and professional experience "indicates a fresh wound." (*Id.* at 182-183). Sgt. Bour did not recall observing any bruising on Fearing's ribs or face. (*Id.* at 178). Sgt. Bour also observed damage to the back door of Fearing's residence and stated that in his professional experience, the damage to Fearing's door depicted in State's Exhibit 4 would have required a great amount of physical force. (*Id.* at 179-180). (*See* State's Ex. 4).

{¶39} Sgt. Bour testified that Fearing told him that after Jackson entered her bedroom, she was preparing to use her cell phone to call law enforcement when Jackson "grabbed her phone and threw it against the wall which caused the phone to break" and to become lodged in a location where she could not locate it. (Apr. 12-13, 2018 Tr., Vol. I, at 180-181). Sgt. Bour was present when Fearing's cell phone was located and stated that her phone was "absolutely not" easily accessible

to her after being thrown by Jackson and that the phone "was in such a position that it was hard to reach." (*Id.* at 181). Sgt. Bour opined that even if Fearing had been able to ascertain the location of her cellular telephone, she would not have been able to easily retrieve it due to its location. (*Id.*). He also testified that the device had broken and was found in two pieces in separate areas of the room. (*Id.*).

{¶40} On cross-examination, Sgt. Bour stated that he was with Fearing when her cell phone was located following the incident and that the phone was located when it rang, allowing them to better ascertain its location. (*Id.* at 190). Sgt. Bour stated that he did not fingerprint Fearing's cell phone after it was found because Fearing was able to render the device operable and needed access to it following the incident. (*Id.* at 184). Sgt. Bour identified Defendant's Exhibits P and Q as photographs which depict Fearing's back door following the incident. (*Id.* at 185-187). (*See* Defendant's Exs. P, Q).

{¶41} Thereafter, the State moved to admit State's Exhibits 1, 2, 3, and 4 and rested. (Apr. 12-13, 2018 Tr., Vol. I, at 194-195). State's Exhibits 1, 2, 3, and 4 were admitted with no objection noted on the record. (*Id.*). The trial court then read the parties' Stipulation Exhibit into the record. (*Id.* at 194-195). The document, which was signed by the State, Jackson, and Jackson's trial counsel, stipulates that Jackson had been previously convicted of five counts of domestic violence. (*Id.* at

194-195). (*See* Stipulation Ex.). Next, Jackson made a Crim.R. 29 motion, which the trial court overruled. (Apr. 12-13, 2018 Tr., Vol. I, at 196-197).

**{¶42}** Jackson testified in his defense. (Apr. 12-13, 2018 Tr., Vol. II, at 201). Jackson stated that on the morning of September 26, 2017, he woke up at Fearing's house, where he was living at the time, and left for work. (*Id.* at 202). Jackson testified that on the evening of September 26, 2017, while at work, he received a text message from Fearing ending their relationship, asking him not to contact her, and telling him he was no longer welcome in her house. (*Id.* at 203). Jackson understood the text message from Fearing to indicate that she was kicking him out of the house he had lived in since March 2017. (*Id.* at 203-204).

**{¶43}** Upon receiving the text message from Fearing, Jackson left work and went to the police station to report the text message to law enforcement. (*Id.* at 204-205). Jackson stated that he then stayed the night at a friend's house. (*Id.* at 205).

**{¶44}** Jackson testified that on the morning of September 27, 2017, he rode his bicycle to Fearing's house to retrieve his belongings and "possibly gain entrance into the house to make sure that all [his] belongings [were] there." (*Id.*). Jackson stated that he "banged on the door," dislodging the doorknob. (*Id.* at 206). Jackson testified that when Fearing did not answer the door, he continued to knock. (*Id.*). Jackson stated he then went to the side door and tapped on the glass, but Fearing still did not answer the door. (*Id.* at 207). Jackson testified that he then walked

around to the back of the house and "bang[ed] on the door pretty hard" with his back to the door because he was "upset." (*Id.*). Jackson stated that when Fearing again failed to answer the door, he came around to the front porch, where his belongings were located, and went through his belongings. (*Id.* at 207-208).

{¶45} Jackson admitted that, while he was on the front porch with his belongings, he interacted with Gene and apologized to Gene for the noise he was making. (*Id.*). Jackson testified that after speaking to Gene, he returned to Fearing's house, slammed the screen door, went around to the back of the house a second time, and left when Fearing did not answer the door because he was "in a time crunch." (*Id.* at 208). Jackson testified that after leaving Fearing's house, he took his belongings to his friend's house and slept the rest of the day. (*Id.* at 209).

{¶46} Jackson stated on September 28, 2017, he rode his bicycle back to Fearing's house in the early morning to retrieve his belongings. (*Id.* at 209-210). Jackson specifically denied having been inside Fearing's residence on September 27 or 28, 2017. (*Id.* at 211).

{¶47} On cross-examination, Jackson admitted that he lived at Fearing's house for approximately six months, that he and Fearing were involved in a romantic relationship, and that the two shared household expenses. (*Id.* at 212). When shown State's Exhibit 4, a photo of Fearing's back door following the alleged incident on September 27, 2017, Jackson could not confirm or deny if he caused the

damage depicted in the photo because he had his back to the door while he was "pounding" on it. (*Id.* at 212-213). He also stated that "the door never worked * * * so it might look [like] somebody did something to it." (*Id.*).

{¶48} Jackson denied being angry when he was at Fearing's house the morning of September 27, 2017, instead insisting he was "firm," "a little disappointed in certain areas," and "trying to hurry and get [his] stuff done so [he] [could] make it to work." (*Id.* at 213). Jackson then confirmed that he testified that he was hurrying while he was at Fearing's house because he needed to go to work and that he also testified that he went to his friend's house and slept all day after leaving Fearing's house. (*Id.*). Jackson stated that the last time he saw Fearing before his arrest was on the morning of September 26, 2017 before he left for work. (*Id.*).

{¶49} Jackson was shown State's Exhibits 2 and 3, which purport to show injuries to Fearing's arm. (*Id.*). (*See* State's Exs. 2, 3). Jackson admitted that he saw bruising on Fearing's arm as depicted in State's Exhibits 2 and 3, but stated that he noticed the bruising prior to September 26, 2017 when Fearing had some blood work done at the doctor's office. (Apr. 12-13, 2018 Tr., Vol. II, at 213-214).

{¶50} Jackson testified that he wanted to enter Fearing's house to confirm that all of his belongings, especially a prescription, were out of the house. (*Id.* at 214-215). Jackson denied entering Fearing's home on September 27, 2017 and

opined that Fearing was lying about Jackson entering her home, striking her, knocking her cell phone out of her hand, and stealing her money. (*Id.* at 215). Jackson also denied making the threatening statement to Fearing on September 27, 2017 and hypothesized that she was taking that statement from a prior argument the pair had on social media. (*Id.* at 215-216).

{¶51} Jackson admitted that he had a prior felony conviction for domestic violence in 2012, a felony conviction for trafficking in cocaine in 2008, and a theft conviction in 2012. (*Id.* at 216). With regard to Gene's, Angela's, and Suzanne's testimony, Jackson stated that he did not know if they were lying. (*Id.* at 217-218).

{¶52} Jackson stated that he took multiple trips to retrieve his belongings from Fearing's house and that, to the best of his knowledge, all of his belongings were accounted for although he stated that he did not have the opportunity to fully inventory his belongings. (*Id.* at 218).

{¶53} On redirect examination, Jackson denied striking or taking any money from Fearing. (*Id.* at 219).

{¶54} Thereafter, Jackson moved to admit his exhibits, all of which were admitted without objection, and rested. (Apr. 12-13, 2018 Tr., Vol. I, at 188); (Apr. 12-13, 2018 Tr., Vol. II, at 220, 223). The State did not present any rebuttal evidence. (Apr. 12-13, 2018 Tr., Vol. II, at 220).

{¶55} We first review the sufficiency of the evidence supporting Jackson's domestic-violence and disrupting-public-services convictions. *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 3551590, *1 (Mar. 26, 1999). With regard to his conviction for domestic violence, Jackson concedes that Fearing was a family or household member and that he has prior convictions for domestic violence. (Appellant's Amended Brief at 5). However, Jackson challenges the sufficiency of the evidence supporting whether he: (1) knowingly caused or attempted to cause (2) physical harm to Fearing. (*Id.* at 5-6). Jackson argues that "the only evidence adduced at trial that [he] caused physical harm to [Fearing] came from [Fearing herself]." (*Id.* at 6). Moreover, Jackson argues that "[n]o other individuals witnessed [the] alleged altercation," that the purported injuries only "consisted of 'redness' and a 'knotting,'" and that Fearing did not seek medical treatment for the alleged injuries. (*Id.*).

{¶56} We disagree. There is sufficient evidence that Jackson knowingly caused or attempted to cause physical harm to Fearing.

{¶57} Jackson's argument that the evidence is insufficient because Fearing's testimony was the only evidence offered at trial to show that Jackson caused physical harm to Fearing is without merit. First, "Ohio courts have held that the testimony of one witness, if believed by the jury, is enough to support a conviction."

*State v. Strong*, 10th Dist. Franklin No. 09AP-874, 2011-Ohio-1024, ¶ 42, citing *State v. Dunn*, 5th Dist. Stark No. 2008-CA-00137, 2009-Ohio-1688, ¶ 133. Fearing testified at trial that Jackson broke into her home through the back door, came into her bedroom, and hit her with his fist on her arm, face, and ribs causing red marks on the side of her face, bruising and swelling on her arm, and red marks on her ribs. (Apr. 12-13, 2018 Tr., Vol. I, at 113-115, 119). Thus, Fearing's testimony alone, if believed by the jury, is sufficient to demonstrate physical harm.

{¶58} Moreover, although Fearing and Jackson were the only individuals present in Fearing's house during the alleged incident, the State provided additional witnesses and evidence corroborating Fearing's testimony. For instance, State's Exhibits 2 and 3 depict bruising on Fearing's arm. (*See* State's Exs. 2, 3). Furthermore, Sgt. Bour testified that he observed bruising and swelling on Fearing's arm and that in his personal and professional experience, the injuries he observed on the morning of September 27, 2017 "appeared * * * to have just happened." (Apr. 12-13, 2018 Tr., Vol. I, at 177-179, 182-183). He also described Fearing's mental state in the aftermath of the incident as "distraught". (*Id.* at 177). Additionally, Gene, Angela, and Suzanne all testified that they heard a commotion and saw Jackson at Fearing's home on the morning of the incident. (*Id.* at 144-146, 153-156, 163-166). Angela testified that she heard screams coming from Fearing's

home, and Angela and Gene observed Fearing's demeanor and injuries to her person in the immediate aftermath of the incident. (*Id.* at 146-147, 155-157).

{¶59} Jackson's argument that the State failed to demonstrate the requisite degree of physical harm because Fearing's injuries "consisted of 'redness and knotting'" and because Fearing did not seek medical treatment for her injuries also fails. First, it has been noted that "R.C. 2919.25 does not require the state to prove that a victim has sustained actual injury since a defendant can be convicted of domestic violence for merely *attempting* to cause physical harm to a family member." (Emphasis sic.) *State v. Nielsen*, 66 Ohio App.3d 609, 612 (6th Dist.1990). Moreover, under R.C. 2901.01(A)(3), "[p]hysical harm to persons" is defined as "*any* injury * * * *regardless* of its gravity of duration." (Emphasis added.). Thus, Fearing's testimony alone constitutes sufficient evidence that Jackson was aware that by striking Fearing on her face, arms, and ribs, he was likely to inflict some type of injury on Fearing, even if that injury ultimately proved to be minor. *See State v. Torman*, 3d Dist. Putnam No. 12-15-10, 2016-Ohio-748, ¶ 31-32 (concluding that the victim's testimony that the defendant squeezed the victim's chin and jaw resulting in minor bruising was sufficient evidence of physical harm); *State v. Ward*, 3d Dist. Seneca No. 13-07-21, 2008-Ohio-84, ¶ 15-21 (concluding that testimony from a witness that the defendant "grabbed the victim by the throat and threw her to the ground" was sufficient for a rational trier of fact to conclude

that the physical harm element of R.C. 2919.25(A) was met); *State v. Summers*, 11th Dist. Ashtabula No. 2002-A-0074, 2003-Ohio-5866, ¶ 31 (noting that the physical harm element of R.C. 2919.25(A) was satisfied despite the victim's failure to seek medical treatment and the absence of corroborating evidence regarding the victim's injuries because the jury believed the victim's testimony regarding the minor bruising and "soreness or stiffness" she suffered).

{¶60} Accordingly, we find that the State presented sufficient evidence from which the jury could conclude that Jackson knowingly caused or attempted to cause physical harm to Fearing.

{¶61} We next review the sufficiency of the evidence supporting Jackson's disrupting-public-services conviction. *Velez*, 2014-Ohio-1788, at ¶ 68, citing *Wimmer*, 1999 WL 3551590, at *1. With regard to his conviction for disrupting public services, Jackson argues "there was no evidence submitted during trial that he acted with purpose to impair any emergency service or law enforcement officer from responding to any emergency." (Appellant's Amended Brief at 6). Jackson asserts that insufficient evidence was presented at trial for a conviction because "nothing was put forth at trial concerning [Jackson's] purpose toward a cellular telephone," "[t]he only evidence concerning [Jackson's] involvement with [Fearing's] cellular phone was that he 'threw it against the wall,'" and any damage to Fearing's cell phone did not render it inoperable. (*Id.* at 7). Jackson also asserts

that "[e]ven if the evidence is viewed [in] the light most favorable to the prosecution, nothing in the record indicated what [Jackson's] alleged purpose was with tossing the cellular telephone." (*Id.*).

**{¶62}** We conclude that the State presented sufficient evidence from which the jury could find Jackson guilty of disrupting public services. First, "[i]n *State v. Robinson*, the Supreme Court noted that the reference to 'damaging or tampering with any property' in R.C. 2909.04(A) includes property such as a private telephone or mobile phone." *State v. Walters*, 5th Dist. Richland No. 17CA65, 2018-Ohio-3456, ¶ 23, citing *Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, at ¶ 29. Thus, Fearing's cellular telephone is property under R.C. 2909.04(A).

> Once it is determined that a defendant damaged or tampered with a victim's telephone, the next consideration is whether that act "substantially impairs the ability of law-enforcement officers, firefighters, rescue personnel, emergency-medical-services personnel, or emergency facility personnel to respond to an emergency or to protect and preserve any person or property from serious physical harm" in order to constitute a violation of R.C. 2909.04(A)(3).

*Walters* at ¶ 23, quoting *Robinson* at ¶ 32. "R.C. 2909.04(A)(3) * * * does not require proof of a substantial impairment of the officers' *response time*. The

pertinent inquiry is directed toward their *ability to respond*." (Emphasis sic.) *Robinson* at ¶ 37.

**{¶63}** Fearing testified that she was in the process of unlocking her phone to call law enforcement when Jackson took it and threw it against the wall. (Apr. 12-13, 2018 Tr., Vol. I, at 113). Ohio courts have held that "under certain circumstances, the act of throwing a telephone can constitute 'damaging or tampering with any property' as a matter of law." *State v. Hill*, 7th Dist. Monroe No. 09 MO 3, 2010-Ohio-4871, ¶ 24. "[T]he deciding factor in these cases is whether the defendant's conduct caused the victim to be unable to use that telephone." *Id.* at ¶ 25.

**{¶64}** Here, viewing the evidence in the light most favorable to the prosecution, Jackson's conduct caused Fearing to be unable to use her cell phone. Fearing testified that Jackson broke into her house through the back door, came into her room as she was attempting to unlock her cellular telephone to call the police, and threw her cell phone against the wall. (Apr. 12-13, 2018 Tr., Vol. I, at 113). Fearing further testified that after her telephone was thrown, she was unable to locate the device, and she went to her neighbor's house following the incident so that she could call law enforcement. (*Id.* at 117-118).

**{¶65}** Fearing stated that she located her phone between the headboard of her bed and her windowsill when her friend called her phone, causing the phone to

ring and allowing Fearing to better ascertain the phone's location. (*Id.* at 133-134). Sgt. Bour was present with Fearing when she located the phone and confirmed her testimony regarding where Fearing's cellular telephone was located. (*Id.* at 184-185, 189-191). Sgt. Bour also testified that based on his observations of the room, Fearing's cell phone was "[a]bsolutely not" easily accessible to her where it was located and that it took the pair some time to locate the cell phone once they entered Fearing's bedroom. (*Id.* at 181). Sgt. Bour also opined that even if Fearing had known exactly where her cell phone was located, it would not have been easily retrieved by her as "[i]t was in such a position that it was hard to reach." (*Id.*). Fearing and Sgt. Bour both testified that Fearing's cell phone was found in two pieces in two separate areas of the room and that the back cover of the cell phone had broken off the device. (*Id.* at 131-132, 181). As such, Jackson's actions caused Fearing to be unable to use the phone.

**{¶66}** Moreover, despite Jackson's argument to the contrary, the telephone does not have to be rendered inoperable to uphold a conviction for disrupting public services. *See Hill*, 2010-Ohio-4871, at ¶ 23, 25 (concluding that throwing the victim's cell phone into a neighboring yard in the dark of night "could support a conviction for disruption of public services in violation of R.C. 2909.04(A)(3)" even when the phone was not rendered inoperable); *State v. Tajblik*, 6th Dist. Wood No. WD-14-064, 2016-Ohio-977, ¶ 5-6, 13-14 (finding sufficient evidence for a

disrupting-public-services conviction where the defendant took the victim's phone and did not allow her to access it for a period of several hours); *Walters*, 2018-Ohio-3456, at ¶ 25-28 (concluding that sufficient evidence existed to find the defendant guilty of disrupting public services where the defendant took the victim's cell phone from her possession and abandoned it, undamaged, in their apartment). Therefore, because Jackson's actions caused Fearing to be unable to use her phone to call for law enforcement or medical services, it is irrelevant that Fearing's phone was functional when it was found following the incident.

{¶67} In addition, we find that the evidence presented is sufficient to establish the element of "substantial impairment." Here, Fearing testified that she was in the process of unlocking her phone to contact law enforcement when Jackson came into her room and threw her phone against the wall. (Apr. 12-13, 2018 Tr., Vol. I, at 113). As a result of Jackson throwing her phone, Fearing was unable to call law enforcement for assistance. (*Id.* at 117-118). Therefore, Fearing was unable to give any information to law enforcement, even partial information, before Jackson took her phone and threw it. Fearing stated that she left her house following the incident to call law enforcement from her neighbor's house since she was unable to locate her cell phone. (*Id.*). In fact, law enforcement was contacted by Fearing's neighbors who heard a disturbance coming from Fearing's residence and not by Fearing herself. (*Id.* at 146). Moreover, it was not until law enforcement was

present on the scene that Fearing was able to locate her phone. (*Id.* at 184-185, 189-190). Thus, the State presented sufficient evidence to establish the "substantial impairment" element of R.C. 2909.04(A)(3). *See Walters* at ¶ 25.

**{¶68}** Finally, the State presented sufficient evidence from which the trier of fact could have concluded that, by taking Fearing's cell phone from her and damaging it, it was Jackson's purpose to substantially impair the ability of emergency-services personnel to respond to an emergency or to protect and preserve Fearing or her property from serious physical harm. Although R.C. 2909.04(A) requires only that a person *knowingly* substantially impair emergency-services personnel by damaging or tampering with any property, proof that a person *purposely* substantially impaired emergency-services personnel by damaging or tampering with any property will suffice. *See* R.C. 2901.22(E) ("When knowledge suffices to establish an element of an offense, then purpose is also sufficient culpability for such element.").

**{¶69}** Here, the State presented sufficient evidence from which the trier of fact could conclude that Jackson specifically intended to substantially impair emergency-services personnel by damaging or tampering with Fearing's cell phone. First, Jackson was on notice that Fearing intended to call law enforcement on Jackson if he attempted to contact Fearing again in any way. (*See* State's Ex. 1). Moreover, per Fearing's testimony, Jackson's first action upon confronting Fearing

after violently breaking into her home was to wrench her cell phone from her hands and throw it out of her reach. (Apr. 12-13, 2018 Tr., Vol. I, at 113). A trier of fact could reasonably infer that the perpetrator of a break-in who takes a cell phone from the hands of the resident of the house in the immediate wake of the break-in does so with the purpose of preventing the resident from contacting law enforcement.

{¶70} Accordingly, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that Jackson committed the offense of disrupting public services under R.C. 2909.04(A)(3).

{¶71} Having concluded that Jackson's domestic-violence and disrupting-public-services convictions are based on sufficient evidence, we next address Jackson's argument that his convictions are against the manifest weight of the evidence. *See Velez*, 2014-Ohio-1788, at ¶ 76.

{¶72} With regard to his domestic-violence conviction, Jackson reasserts his arguments made in his first assignment of error. (Appellant's Amended Brief at 8). Specifically, he argues that "[Fearing] was the sole witness presented by the state concerning the causation of physical harm to [Fearing]" and that "[e]ven if the jury was able to determine [Fearing] had injuries at the time [Sgt. Bour] conducted his investigation, the causation element was not met." (*Id.*).

{¶73} After weighing the evidence and evaluating the credibility of the witnesses, with appropriate deference to the trier of fact's credibility determination,

we cannot say that the jury clearly lost its way and created a manifest injustice with regard to the domestic-violence conviction. Thus, we conclude that Jackson's domestic-violence conviction is not against the manifest weight of the evidence as the evidence weighs in favor of a finding that Jackson committed domestic violence against Fearing.

**{¶74}** First, Jackson's argument that his domestic-violence conviction is against the manifest weight of the evidence because "[Fearing] was the sole witness presented by the state concerning the causation of physical harm to [Fearing]" is without merit. As discussed above, Fearing testified that Jackson struck her on her arm, face, and ribs resulting in red marks on the side of Fearing's face, bumps on her arm, and red marks on her ribs. (Apr. 12-13, 2018 Tr., Vol. I, at 113-114, 118-119). In addition, State's Exhibits 2 and 3 depict bruising on Fearing's arm. (State's Exs. 2, 3). Moreover, the State's additional witnesses corroborate Fearing's testimony. Sgt. Bour indicated that he observed bruising and swelling on Fearing's arm the morning of the incident, and Gene testified that when he saw Fearing immediately following the alleged incident, "[s]he looked like she had been beaten up." (Apr. 12-13, 2018 Tr., Vol. I, at 146, 178-179). Fearing's three next-door neighbors all testified that they observed Jackson at Fearing's house the morning of September 27, 2017 and heard a commotion coming from Fearing's house coinciding with the time of the alleged physical encounter. (*Id.* at 144-145, 153-

156, 163-166). Moreover, Sgt. Bour indicated that in his personal and professional experience, the bruising and swelling he observed on Fearing's arm the morning of September 27, 2017 appeared to be consistent with a "fresh wound." (*Id.* at 182).

{¶75} On the other hand, although Jackson admitted that he was at Fearing's residence on the morning of September 27, 2017, he denied entering Fearing's residence or causing any physical injury to Fearing. (Apr. 12-13, 2018 Tr., Vol. II, at 205, 213-216, 219). Furthermore, he opined that the bruising observed in State's Exhibits 2 and 3 was the result of blood work Fearing had done prior to the day of the alleged incident. (*Id.* at 213-214).

{¶76} In sum, there is undeniably conflict between the State's version and Jackson's version of the events of September 27, 2017. Consequently, this case hinges on witness credibility. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *DeHass*, 10 Ohio St.2d 230 at paragraph one of the syllabus. "'When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact."'" *State v. White*, 3d Dist. Seneca No. 13-16-21, 2017-Ohio-1488, ¶ 50, quoting *In re N.Z.*, 11th Dist. Lake Nos. 2010-L-023, 2010-L-035 and 2010-L-041, 2011-Ohio-6845, ¶ 79, quoting *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). "'A fact finder is free to believe all, some, or none of the testimony of

each witness appearing before it.'" *Id.*, quoting *In re N.Z.* at ¶ 79, citing *State v. Thomas*, 11th Dist. Lake No. 2004-L-176, 2005-Ohio-6570, ¶ 29. *See also State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 44, quoting *State v. Daley*, 3d Dist. Seneca No. 13-13-26, 2014-Ohio-2128, ¶ 68, quoting *State v. Antill*, 176 Ohio St. 61, 67 (1964). ""'A verdict is not against the manifest weight of the evidence because the [jury] chose to believe the State's witnesses rather than the defendant's version of the events."'" *Missler* at ¶ 44, quoting *State v. Bean*, 9th Dist. Summit No. 26852, 2014-Ohio-908, ¶ 15, quoting *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. As such, the jury was able to assign whatever credibility it deemed appropriate to the witnesses presented. Therefore, the fact that the jury believed Fearing and the State's witnesses does not make Jackson's domestic-violence conviction against the weight of the evidence, even when Fearing and Jackson were allegedly the only individuals inside the house when the alleged incident occurred.

{¶77} With regard to his disrupting-public-services conviction, Jackson asserts "there was no evidence presented at trial as to [his] purpose" regarding Fearing's phone. (Appellant's Amended Brief at 9). Specifically, Jackson argues that "[n]othing was presented alleging that [Fearing] communicated what she was attempting to do with her cellular telephone to [Jackson] at the time he allegedly took the cellular telephone." (*Id.*). Further, Jackson argues that Fearing's cellular

phone "continued to be in working order" and was able to send and receive calls following the alleged incident. (*Id.*).

**{¶78}** We conclude that Jackson's disrupting-public-services conviction is not against the manifest weight of the evidence. Jackson's argument that "there was no evidence presented at trial as to [his] purpose" with respect to Fearing's cell phone is without merit. "'The determination of a defendant's mental state, absent some comment on his or her part, must of necessity be determined by the nature of the act when viewed in conjunction with the surrounding facts and circumstances.'" *State v. Hartman*, 2d Dist. Montgomery No. 26609, 2016-Ohio-2883, ¶ 27, quoting *State v. Mundy*, 99 Ohio App.3d 275, 288 (2d Dist.1994), citing *State v. Lott*, 51 Ohio St.3d 160, 168 (1990). This includes whether the defendant acted purposely in undertaking a given course of conduct. *See, e.g., id.* at ¶ 27-33. Here, from the facts and circumstances surrounding the alleged incident, it can be inferred that by wrenching Fearing's cell phone from her hands, damaging it by throwing it against a wall, and rendering it inaccessible, Jackson specifically intended to substantially impair the ability of law enforcement officers to prevent serious physical harm to Fearing's person or her property.

**{¶79}** First, Fearing testified that she was fearful of Jackson due to "warning signs" she had observed in the previous weeks. (Apr. 12-13, 2018 Tr., Vol. I, at 122). It is undisputed that Fearing terminated her relationship with Jackson on

September 26, 2017 via text message and told Jackson, "[i]f you attempt to return or have any contact with me in person, via phone or otherwise I will contact the police * * *." (Apr. 12-13, 2018 Tr., Vol. I, at 111-112); (Apr. 12-13, 2018 Tr., Vol. II, at 203); (State's Ex. 1). Fearing also testified that in the early morning of September 27, 2017, she heard pounding on her doors and windows followed by a noise from the back door "sound[ing] like a door busted in." (Apr. 12-13, 2018 Tr., Vol. I, at 113). Fearing's next-door neighbors likewise testified that they heard loud noises coming from Fearing's house and observed Jackson pounding on the doors. (*Id.* at 144-145, 154-156, 163-165). Fearing further testified that Jackson appeared in her bedroom moments later while she was in the process of unlocking her cell phone to call law enforcement. (*Id.* at 113). Fearing stated that Jackson's first action upon entering the room was to remove her cell phone from her hands and throw it at the wall, rendering the device inaccessible. (*Id.*). Sgt. Bour corroborated Fearing's testimony that the phone was found in two pieces and in an inaccessible location. (*Id.* at 180-182). Defendant's Exhibits H, I, and J corroborate Fearing and Sgt. Bour's testimony regarding the location and condition of the device following the alleged incident. (*See* Defendant's Exs. H, I, J). As discussed above, the trier of fact was entitled to credit all, part, or none of Fearing's testimony. *White*, 2017-Ohio-1488, at ¶ 50.

**{¶80}** Fearing's testimony presents a scenario in which a person violently breaks into a home and, on first encountering the resident, deprives that person of their means to call for help. When a person breaks into a residence and their first act is to deprive the occupant of their means for contacting the outside world, a natural and probable inference is that they did so with the intention of preventing the occupant from calling the police.

**{¶81}** Moreover, even though Fearing did not testify that she verbally communicated to Jackson her intention to call law enforcement with her cell phone when he entered her bedroom, her purpose can be inferred from the totality of the circumstances. Fearing had terminated her relationship with Jackson the day before and had explicitly told Jackson that she would contact the police if he attempted to return to her home or contact her. (Apr. 12-13, 2018 Tr., Vol. I, at 111-112); (State's Ex. 1). Therefore, Jackson had been put on notice that Fearing intended to call the police if he returned to her residence or made contact with her. Furthermore, as the door to her house had just been broken in and her estranged boyfriend had entered her bedroom despite being told the day before not to come back to the residence, the totality of the circumstances indicate that Fearing's purpose in unlocking her cellular telephone was to contact law enforcement.

**{¶82}** Finally, Jackson's argument that his disrupting-public-services conviction is against the manifest weight of the evidence because Fearing's cell

phone "continued to be in working order" and was able to send and receive calls following the alleged incident also fails. It is undisputed that Fearing's cell phone was able to send and receive telephone calls following the alleged incident. (Apr. 12-13, 2018 Tr., Vol. I, at 133-134, 184, 190). However, Jackson's argument regarding the functionality of Fearing's cell phone following the alleged incident goes largely to the sufficiency of the evidence supporting Jackson's disrupting-public-services conviction and was accordingly addressed with regard to the sufficiency of the evidence. In addition, we note that Fearing and Sgt. Bour testified that Fearing's cell phone was not recovered until after the alleged incident and after law enforcement had arrived on the scene. (*Id.* at 117, 133-134, 183, 190). Moreover, Fearing and Sgt. Bour also testified that the cell phone was found in two pieces, with the back cover broken off the device. (*Id.* at 131-132, 181). Defendant's Exhibits H, I, and J, which depict Fearing's cell phone in the state in which it was found, are consistent with Sgt. Bour's and Fearing's testimony regarding the condition of Fearing's cell phone when it was found. (*See* Defendant's Exs. H, I, J). Therefore, having weighed the evidence and all reasonable inferences, we conclude that Jackson's disrupting-public-services conviction is not against the manifest weight of the evidence.

{¶83} For the foregoing reasons, Jackson's first and second assignments of error are overruled.

**{¶84}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/jlr**